GEORGIA ASSOCIATION OF RETARDED CITIZENS, individually and in behalf of its members and class; Russell Caine, individually and in behalf of others similarly situated, by and through his parents and next friends, L. Douglas Caine and Virginia Caine; and L. Douglas Caine and Virginia Caine, individually and in behalf of others similarly situated, Plaintiffs,

v.

Dr. Charles McDANIEL, in his official capacity as State Superintendent of Schools and individually; Roy A. Hendricks, A. J. McClung, Mrs. Saralyn Oberdorfer, James F. Smith, Hollis Lathem, Thomas K. Vann, Jr., Pat G. Kjorlaug, Larry A. Foster, Sr., Asbury Stembridge, and Carolyn Huseman, in their official capacities as State Board of Education members and individually; the State Board of Education, State of Georgia; Dr. Sylvester Rains, in his official capacity as Superintendent of the Savannah-Chatham County Board of Education and individually; Dr. Donald Knapp, Dr. Martha Fay, Rev. William F. Stokes, II, Emma Adler, Captain Robert Funk, Ester F. Garrison, Spencer Lawton, Jr., Betty McClenden, and Dr. Robert Moreland, Jr., in their official capacities as members of the Savannah-Chatham Board of Education and individually; and the Savannah-Chatham Board of Education, Defendants.

Civ. A. No. C78–1950A.

United States District Court, N. D. Georgia, Atlanta Division.

April 3, 1981.

Jonathan A. Zimring, John L. Cromartie, Jr., Michael Morris, Atlanta, Ga., Lawrence Ringer and Rose Firestein, for plaintiffs.

Alfred L. Evans, Jr., Atlanta, Ga., Griffin B. Bell, Jr., Savannah, Ga., for defendants.

## MEMORANDUM OPINION

HORACE T. WARD, District Judge.

### I. Introduction.

#### A. Description of the Case

This is a class action lawsuit to redress an alleged deprivation of rights under the Education for All Handicapped Children Act ("Handicapped Act"), 20 U.S.C. § 1401 et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794; the Equal Protection and Due Process Clauses of the Fourteenth Amendment; the Adequate Program for Education in Georgia Act, Ga.Code Ann. § 32–601a et seq.; and the Georgia Constitution. This court's jurisdiction is invoked pursuant to 20 U.S.C. § 1415(e) and 28 U.S.C. § 1343.

The named plaintiffs are the Georgia Association of Retarded Citizens ("GARC"), a nonprofit statewide organization created to promote the interests of mentally retarded citizens of all ages; Russell Caine, a pro-

foundly mentally retarded child; and L. Douglas and Virginia Caine, Russell's parents. The defendants are the State Superintendent of Schools, the State Board of Education, and the individual members of the State Board of Education ("state defendants"). Also named as defendants are the Superintendent of the Savannah-Chatham School System, the Savannah-Chatham Board of Education, and the individual members of the Savannah-Chatham Board of Education ("local defendants").

In essence, plaintiffs contend that defendants have policies or practices of refusing to consider the needs of mentally retarded children for educational terms in excess of the traditional 180-day school year. They contend that Russell Caine and certain other identified members of the class have shown a need for such additional schooling but that defendants, pursuant to their policies and practices, have refused to provide it. It is plaintiffs' position that these policies and practices of the defendants violate the rights of the plaintiffs under the Handicapped Act, as well as violating their rights under Section 504, the United States Constitution, and state law. They seek injunctive relief against the continued application of the policy and a mandatory injunction requiring the provision of extended school years to the named plaintiffs and certain other members of the class. Plaintiffs also seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that the policies of the defendants violate the above-cited statutory and constitutional provisions.

The defendants, on the other hand, contend that they have no policy or practice precluding consideration of a child's need for education beyond the traditional 180 days. They argue that the named plaintiffs and other identified members of the class have shown no need for an extended school year, and that in any event, the Handicapped Act does not require them to provide any more than 180 days of schooling. Defendants have filed a motion for judgment on the pleadings as to all of plaintiffs' claims other than the claim under the Handicapped Act. The local defendants have additionally filed a motion to dismiss the individually named defendants as parties to this action and, with the state defendants, motions to redefine the class.

### B. *History of the Case*

This matter was initiated in early 1978 by Mr. and Mrs. Caine's appeal of a decision by the local school board denying their request that the school system provide Russell with a 12-month educational program. An administrative hearing was held before the Chatham County Hearing Review Board on April 18, 1978, and the Caines subsequently received an adverse decision. The parents timely appealed to the State Board of Education in May of 1978, and the State Board ruled against them in October, 1978. The Caines then filed this action for review pursuant to the Handicapped Act in November of 1978, joining other legal and factual issues. In June, 1979, an evidentiary hearing on plaintiffs' motion for preliminary relief and for class certification was held before the Honorable Harold Murphy of this court.

Judge Murphy denied the plaintiffs' motion for preliminary relief the following month on two grounds. The court found that plaintiffs had not demonstrated so substantial a threat of irreparable injury as to merit the entry of preliminary relief, and also that a preliminary injunction would disserve the public interest. In that same order, Judge Murphy certified this matter as a class action on behalf of two separate classes. The first class was defined as follows: "All handicapped children of school age in the state of Georgia who are mentally retarded, and who, because of their special needs, require more than 180 days of public school programming of special education and related services." Members of this class, whose parents testified at the trial, include—other than Russell Caine—Christopher Hodgson, Keith Jenny, and Anthony Jackson, all severely mentally retarded children from Chatham County. The second class was composed of the parents or guardians of all children in the first class.

Following transfer of the case to this judge, it was tried without a jury in the summer of 1980. Requiring three (3) weeks of testimony, the trial produced approximately 30 witnesses, many of whom were

experts, and thousands of pages of exhibits for the court's consideration. The matters in dispute are highly emotional and were hotly contested by both sides.

## C. *Issues Presented*

The central issue raised by this action is whether Russell Caine, a profoundly mentally retarded child, and other members of the class he represents are entitled to be considered for or to receive more than 180 days of free public education in order for the state appropriately to meet its obligations under applicable federal and state statutes. In order to decide this question, the court must consider several more specific issues, the most important of which are the following: (1) whether the local and state defendants, or either of them, maintain a policy or practice of failing to consider or provide for the needs of mentally retarded children for education in excess of 180 days per school year; (2) whether, if the policy or practice is found to exist, it violates applicable federal or state statutes; and (3) whether the evidence shows that the named plaintiff or other members of the class suffered a sufficient degree of regression or other detrimental effects from the breaks in educational programming to demonstrate a need for an extended school year. The court must also determine whether the Handicapped Act and Section 504 can both be applied in this action, and consider the applicability of the other statutory and constitutional provisions alleged to have been violated.

## II. *Findings of Fact*

### A. *Background*

Mental retardation is a condition in which an individual's intellectual functioning skills are substantially below those of an average person of the same age. The degree of mental retardation can vary from the mildly or educably mentally retarded, whose intelligence quotients range between 70 and 50 and who may become independent, productive members of society, to the profoundly or severely mentally retarded

("PSMR") whose I.Q.'s are generally below 30 and who may have to be fully supervised for their entire lives. Many mentally retarded children lack basic living skills and have physical handicaps as well. This is more likely to be true the greater the degree of mental retardation, and particularly common with PSMR children. Plaintiff Russell Caine and the members of his class identified above are PSMR children.

Because of community fears and a belief that they could not be educated, mentally retarded children were historically excluded from the public schools in Georgia and the rest of the United States. Many were institutionalized for their entire lives. Even though the treatment of the mentally retarded improved with time, early school programs providing services for the mentally retarded still did not include the PSMR child. When school-like services were finally provided for PSMR children, it was in the form of year-round segregated training centers which fell below the standards of public schools in many respects. In Chatham County, the St. Johns Training Center was operated by the Chatham Association for Retarded Citizens with the financial support of the Georgia Department of Human Resources to provide services for PSMR children on a year-round basis.

Judicial decisions in the early 1970's recognizing the rights of the mentally retarded to receive the benefits of public education led to the passage of major legislation to remedy the problem.[1] This legislation included Section 504 and the Handicapped Act. The Handicapped Act, 20 U.S.C. § 1401 *et seq.*, is a funding statute to assist states in providing a free appropriate education to all handicapped children, and has several requirements for states receiving funds under it. Section 504, codified at 29 U.S.C. § 794, prohibits discrimination against handicapped persons in all programs receiving federal financial assistance.

The state and local defendants in this action are recipients of funds under the Handicapped Act and therefore subject to

---

1. *See, e. g., PARC v. Commonwealth of Pennsylvania*, 334 F.Supp. 1257 (E.D.Pa.1971), 343 F.Supp. 279 (E.D.Pa.1972), and *Mills v. Board of Education of District of Columbia*, 348 F.Supp. 866 (D.D.C.1972).

its provisions and the provisions of Section 504. 20 U.S.C. § 1413 requires any state desiring to receive the Handicapped Act funds to submit to the Commissioner of Education a "state plan" implementing an educational program for handicapped children. Requirements for those plans are also specified in § 1413.

Georgia's State Board of Education submitted state plans to the United States Commissioner of Education to qualify for funding for fiscal years 1978–79 and 1979–80. The Bureau of Education for the Handicapped, a division of the United States Office of Education, approved Georgia's state plans and allowed the state to receive funding for the aforementioned fiscal years. Georgia's state plans do not require local school systems to provide educational services for the mentally retarded in excess of the traditional nine month school year, but apparently do not prohibit the provision of such extended educational services. As will be more fully discussed below, the state defendants have taken the position that their policy regarding the provision of schooling in excess of 180 days is "permissive," that is, they will allow a local agency to provide excess schooling if the local agency so desires. The evidence reveals only one local educational agency which routinely provides more than 180 days of schooling for its mentally retarded children. The Board of Education of Douglas County, Georgia, provides a summer program for mentally retarded students based on the children's Individual Education Programs ("IEPs").[2] The Savannah-Chatham school district, like the other local educational agencies, only has 180-day programs.[3]

The Exceptional Children's Center ("ECC") has been operated by the Savannah-Chatham County School System for the past two years to provide services for mentally retarded children. There is general agreement that the quality of programming provided by ECC during the nine months that it is in service is quite good. The evidence revealed that the local defendants spend significantly more money per pupil for the students at ECC than for the normal children in the school system, and that the teacher-pupil ratio is approximately one to one. Although the plaintiffs admit that the quality of instruction at ECC is good, they argue that it should be extended to more than 180 days in duration.

B. *The 180-Day Policy*

1. *Local Defendants*

█ The local defendants contend that they have never had an express or implied policy prohibiting the consideration of whether a PSMR child's unique needs require more than 180 days of schooling. They state that when devising an individual education program for a particular child, the needs of the child for year-round programming are indeed considered. It is their position that if a child were found to need an extended program, his IEP would reflect it and an extended program would be recommended. After careful consideration of this matter, the court concludes that the evidence belies these contentions.

No PSMR child has ever been found by the local defendants to require more than 180 days of school, and consequently, no program has ever been developed for a PSMR child to receive more than the traditional 180 days. Although it is possible that none of the children would require a year-round program, it is likely that if full consideration had been given to each child's need, at least some of the children would have been found to require some amount of education beyond the traditional nine months. The fact that all of the PSMR children in the Savannah-Chatham school district were uniformly found to require only 180 days of school indicates that the educational needs of these children were considered in the context of the amount of schooling available to them, 180 days, rather than in light of what would be required to achieve reasonable educational objectives.

---

**2.** See pp. 1276–1277 *infra.*

**3.** This does not include various voluntary programs and special programs that are designed to assist certain mildly retarded children. At issue in the instant case are only programs which are systematically and routinely provided by school districts.

Furthermore, in the local defendants' answers to the plaintiffs' first interrogatories the local defendants stated that "the Savannah-Chatham Public School System provides educational programs for all students for 180 days." That answer was given in response to Interrogatory # 14 which asks whether the local defendants have any policy on the duration of educational services provided mentally retarded children. Also in response to Interrogatory # 14, the local defendants quote the following provision of Policy No. 0971, adopted June 21, 1978: "The school year will consist of 180 actual attendance days for the students." The local defendants' response to Interrogatory # 14 indicates that, at the time the interrogatories were answered, they had a policy limiting the school year for mentally retarded children to 180 days.

Additional evidence of the existence of a policy is found in the decisions of the local defendants in cases where the parents of mentally retarded children requested school years in excess of 180 days. The local defendants' refusals of these requests were grounded in the fact that the state only funded 180 days, and therefore that was all that would be provided. The needs of a child were in no instance articulated as the reason for refusing the request for an extended school year, only the lack of funding. In fact, the Chatham County Hearing Review Board (not a part of the Chatham County Board of Education), in its ruling on Russell Caine's appeal from the adverse decision of the local board of education, found that although there was some evidence of Russell's need for an extended school year, the 180 days provided was adequate because that was all that was required under state law.[4] The fact that the local defendants refused requests for extended school years because the state only required and funded 180 days indicates that the local defendants had a policy or practice of refusing to consider the needs of a child beyond 180 days.

None of the parents who testified at trial indicated that they had been told that their child did not require in excess of 180 days, or that their child had been considered for schooling in excess of 180 days. It seems likely that if the local defendants did in fact consider each child's needs for a year-round program, there would have been some discussion of this consideration with the parents, particularly if it had been found that their child did not require more than 180 days of schooling. This failure to articulate to parents the fact that their children had been found not to require more than 180 days of school or that their children had been considered for more than 180 days indicates that there had been no such finding or consideration.

In light of the evidence discussed above, the court concludes that the local defendants did have a policy or practice of refusing to consider or provide for a mentally retarded child's educational needs beyond 180 days.

### 2. State Defendants

The state defendants contend that their policy regarding the provision of an extended school year for mentally retarded children is permissive. They argue that while the federally approved state plans under the Handicapped Act do not require local school systems to provide more than 180 days, local school systems are not prohibited from doing so and may provide extended school years if they desire. After careful consideration, the court concludes that the contentions of the state defendants are not borne out by the evidence.

The State Board of Education, as an appellate body in cases in which parents appealed the denial of extended school years by local boards, has never ordered a local board to consider a student's needs beyond 180 days or to provide in excess of 180 days for any student. In most of the cases that were appealed the State Board simply

---

4. The written decision of the local hearing officer contained the following statement: "Evidence presented indicated that there is no need for a continuous program to optimally meet Russell Caine's needs, however, state law does not provide a funding pattern that will allow local educational agencies to operate beyond the 180 day school year." Plaintiffs' Exhibit 1, hearing of April 18, 1978, page 5.

adopted the recommendation of the hearing officer, which was often based on the fact that there was no legal requirement that local boards pay for education in excess of 180 days.[5] In fact, there was some testimony that the State Board even instructed the hearing officers that they had no authority to order more than 180 days.[6] At any rate, in very few of these cases was there any discussion of whether or not the children needed more than 180 days of school.[7]

Under the Handicapped Act, the state defendants have a duty to make sure that local educational agencies receiving funds under it provide an appropriate education for handicapped children.[8] In monitoring the plans and programs of local educational agencies, the state defendants do not require the local boards to consider the need for schooling in excess of 180 days, or to provide it if needed. In fact, the state defendants have informed the local defendants that they need not consider whether a child needs schooling in excess of 180 days.[9] The evidence indicated that the state defendants have made clear their position

---

5. See Plaintiffs' Exhibits. 37, 90, 91, 92, 93, and 94.

6. In a deposition taken on April 30, 1979 in connection with this proceeding, Eldon Basham, then legal assistant for the State Department of Education, testified as follows in response to questions from plaintiffs' counsel:

Q. Did you deal with the problem of what would occur if they found a program inadequate but did not suggest an alternative program?
A. In terms of saying that the school would have to come up with an appropriate program.
Q. Did you talk to them about the scope of things they could consider as to the issues of adequacy or not?
A. No.
Q. Have you ever spoken or trained or presented any correspondence to any hearing officer concerning whether or not they could consider more than 180 days during the scope of the due process hearing?
A. Not whether they can consider it, but whether they have the authority to order it. We said that we do not know whether the law requires more than 180 days, and have said that we do not think it is within their authority to order a school system to provide more than 180 days, but not that they can't consider it; just that we did not think—
Q. It was within their authority?
A. [Nods head affirmatively.]
Plaintiffs' Exhibit 24, page 13–14.

7. In re JEBG, Case No. 1979–5, is illustrative. This case involved an appeal by a local school system from an order of a local hearing officer requiring the school system to provide a student with an 11-month program. Although the state hearing officer recommended that the decision of the local hearing officer be upheld, the State Board of Education refused to accept this recommendation on the ground that a local board is only responsible for the educational cost of a 180-day program. This case and the other cases discussed in the text indicate the state defendants' policy regarding the provision of schooling in excess of 180 days.

8. See 20 U.S.C. §§ 1412(6), 1414(d); pp. 1277–1278 infra.

9. Dr. Allen W. Gurley, the director of the Division of Early Childhood Special Education, Title I of the State Department of Education, gave three separate depositions in connection with this proceeding which were all admitted into evidence as plaintiffs' exhibits. In a deposition taken in April of 1979, Dr. Gurley testified as follows in response to questions from plaintiffs' counsel:

Q. Do you correspond with hearing officers for the school districts for the purposes of mediation?
A. I have discussed mediation by phone with superintendents and administrative staffs.
Q. And during the discussions, has it included discussions of the word "appropriate" for the purposes of their providing educational services?
A. I don't recall.
Q. Has it included discussions of the word "adequate"?
A. I don't recall.
Q. Have you had any discussions concerning whether a school district needed to provide more than 180 days of school?
A. Yes.
Q. When did you have those discussions?
A. I don't recall.
Q. Have you had several discussions or a few discussions?
A. Very few.
Q. Have you been asked a question whether they have been required to so provide?
A. Right.
Q. And what has been your response?
A. No.
Q. Is that the policy of the state, that there is no policy requirement to provide?
A. Yes.
Q. And what is the basis or the legal authority, as you understand it, for that policy?
A. The State Board of Education.

that if any local educational agency determines that a child is in need of an extended school year, that local agency will be responsible for providing for the cost of the school year to the extent that it exceeds 180 days.[10]

It is apparent that although the state defendants' policy does not expressly pro-hibit the consideration or provision of an extended school year, it has that effect. If any local educational agency were to find that a child needed schooling in excess of 180 days, that local agency would have to bear its cost alone. The specter of having the responsibility for such a financial burden without any expectation of assistance might very well deter local educational

Q. Has the State Board of Education passed on that official policy?
A. They have taken deposition in the hearing.
Q. And what hearing was that?
A. It's a hearing involving a child in Savannah.
Q. The hearing that was the hearing before this particular case?
A. Right.
Q. And it is your understanding that their position is a school district need not provide more than 180 days of services, even if the child's special needs would so require those services?
A. That is correct.

Later in the same deposition, Dr. Gurley testified as follows:

Q. Have you ever been asked as to whether they need to make that consideration?
A. It's been a practice that our services would be provided for 180 days, and if I had been asked, that's what I would say.
Q. So if a child is evaluated, he is evaluated for 180 days of school?
A. That is right.
Q. And an IEP is written for only 180 days in mind?
A. [Nods head affirmatively.]
Q. And there is no separate consideration as to whether that child would need 200 days or 300 days of school?
A. There may be by an LEA (local educational agency), but it would be at the LEA's own prerogative.
Q. And they would not receive any additional pass-through funds or additional state funds?
A. That's true.

Plaintiffs' Exhibit 23, pages 81–84.

**10.** Dr. Herbert D. Nash, then the director of the Special Education Program of the State Department of Education, gave a deposition in April of 1978 in connection with the administrative proceeding in this case. In that deposition, admitted into evidence as Plaintiffs' Exhibit 18, Dr. Nash testified as follows in response to questions from plaintiffs' counsel:

Q. Is it not possible, sir, that a free and appropriate public education designed for a child's unique needs could include a program that is more than 180 days?
A. If the local education agency assumes the responsibility for costs and for providing such a program though it extend beyond 180 days the answer would be yes.
Q. And that is under your understanding of the federal definition and requirements?
A. Yes.

Plaintiffs' Exhibit 18, page 25. In the same deposition, Dr. Nash testified that Georgia's "state plan" does not require local agencies to provide more than 180 days of school for mentally retarded children. Plaintiffs' Exhibit 18, page 11.

In a deposition also taken in April, 1978, Dr. Gurley testified further on this particular point:

Q. Now, if a local school district either voluntarily or under the requirement of a court order was forced to furnish more than or was required to furnish more than the 180 days of school, would they receive any state funds to your knowledge from the Department of Education under A.P.E.G. or any other program that you know of to help defray the costs of the additional school days?
A. I know of no funding source at this time . . .

Plaintiffs' Exhibit 17, page 16.

In a deposition taken as late as March of 1980, Dr. Gurley testified as follows:

Q. Does the state have a policy of whether they will fund or require the funding of private school placement for more than 180 school days or 270 calendar days?
A. Our assistance to the local school districts in what is known as a tuition grant is only for the regular school year, the nine months, the 180 school days or the 270 calendar days which are synonymous as far as time concerned.
Q. If a child's IEP which includes a private school placement requires that the placement be for a full or more than 180 school days or 270 calendar days, is there any policy, practice of the state board as to whether that should be funded by the local educational agency?
A. Local educational agencies have been advised that they are not prohibited from doing this.
Q. Have they been advised whether they are required to pay for it?
A. They are required to pay for what they agreed to in the IEP.

Plaintiffs' Exhibit 50, page 19.

agencies from considering the needs of handicapped children for schooling in excess of 180 days. In addition to refusing to pay for longer schooling, the state defendants have made it clear to the local districts that they need not consider a child's needs for such excess schooling. When viewed in this light, it is clear that the state defendants' policy, although neutral on its face, has the effect of prohibiting the consideration of a child's needs beyond 180 days.

In addition to the evidence discussed above, there was some testimony from representatives of the state defendants relating to the existence of a limiting policy. Employees of the State Department of Education testified that they understood the State Board's policy to be that 180 school days is all local school districts are required to provide.[11] A 180-day school year has been the tradition in this state, and all plans are made with that period of time in mind.

The court is of the opinion that the decisions of the State Board in cases involving extended school years, the position of the State Board regarding the consideration of needs for schooling in excess of 180 days by local boards, and the testimony of Department of Education officials about state board policy all evidence the existence of a policy on the part of the state board which would prohibit the consideration of a child's needs for schooling in excess of 180 days. The court concludes that both the local defendants and the state defendants, contrary to their contentions, have policies which prohibit the consideration of mentally retarded children's needs for schooling in excess of 180 days and the provision of such excess schooling if necessary.

## C. Effects of Breaks in Programming

During the trial a substantial amount of time was consumed in the presentation of evidence on the effects of breaks in pro-

gramming on the educational achievement of mentally retarded children. The plaintiffs contend that long interruptions in programming cause the mentally retarded to suffer a significant amount of "regression."[12] They maintain that regression is likely to occur during the three-month summer break and that, generally, mentally retarded children suffer greater regression and with worse effect than normal children. The defendants contend that there has not been a sufficient showing of regression to merit relief, that the evidence presented does not show that the mentally retarded children involved in this case regressed during the summer of 1979, and that a break in school programming for the summer is beneficial in many respects.

### 1. Plaintiffs' Evidence

The plaintiffs produced a considerable amount of expert testimony seeking to support their contention regarding the damaging effect of summer breaks in programming. This evidence was to the effect that mentally retarded children can suffer educational regression during interruptions in programming, with direct consequences on their progress. There was testimony that regression might involve the actual loss of skills previously acquired or a lack of motivation to perform skills that a child had retained, and included assertions that regression can cause primitive and self-destructive behavior and possibly affect many skills, including motor and communications abilities. The leading expert witness presented by the plaintiffs was Dr. Paul Alberto, an expert in the area of special education and a professor at Georgia State University. He testified that in his opinion certain external environmental influences can be detrimental to a retarded child during the acquisition phase of learning. Dr. Alberto testified that interruption of the learning process in the structured environ-

---

11. See Gurley Deposition of April, 1978 at pages 15 and 34; Nash Deposition at pages 8 and 13; and Gurley Deposition of April, 1979 at page 82.

12. The evidence showed that there was no common definition of the term regression. In

addition to varying definitions, the evidence also showed that there is no common agreement as to what variables (forgetting, motivation, etc.) are masked by the term. The term will be used in this order to refer to a drop in a child's level of performance.

ment of the school could cause regression. He further testified that mentally retarded children are more likely to regress than normal children because their relative inability to adjust to new environments could cause them to use acquired skills less frequently than normal children. Dr. Alberto stated that when acquired skills are used less frequently the child is more likely to lose them.

The plaintiffs' expert testimony generally supported the position that educational regression can have dire consequences for PSMR children since so many of the skills that PSMR children learn are basic living skills. These experts generally agreed that a continuous program of education would lessen the likelihood of educational regression in many such children.

While plaintiffs' expert testimony was scholarly and generally of a persuasive nature on the possibility of regression in mentally retarded children because of summer breaks in programming, it must be noted that the evidence was theoretical. Plaintiffs' witnesses conceded that there is very little empirical data on the subject of regression in mentally retarded children. In addition to the expert testimony, plaintiffs presented other evidence seeking to show regression in specific children, mainly through the testimony of their parents.

## Specific Children

### Russell Caine

Russell is a PSMR child approaching the age of puberty with a mental age of approximately two. In addition to being retarded, Russell suffers from certain physical handicaps. There was testimony that he showed some regression over weekends and holidays while he was at the St. Johns Center prior to his entering the public school system. Russell's mother testified that she was not able to work as successfully with Russell as were more highly trained personnel, and that she could not get him to perform his skills with the same degree of quality that other persons could. She further testified that she observed a deterioration in his walking and feeding skills during the summer months of 1979. A physical therapist at ECC testified that she had to restrict the number of persons who could walk with Russell during the 1979–80 school year because Russell was demanding too much support from them. Dr. Bill Weaver, a licensed psychologist, performed certain evaluations on Russell in 1979 and 1980 which generally indicated that the child had made little progress since entering ECC. The plaintiffs contend that the above constitutes sufficient evidence of regression in Russell to merit a continuous educational program.

### Christopher Hodgson

Christopher Hodgson is a severely retarded child attending ECC in Savannah. Christopher's mother testified that her son exhibited an increased amount of behavior problems during the summer of 1979, including feces smearing, head-banging, and destructive tantrums. Some of these problems continued when Christopher returned to school. It is the plaintiffs' contention that these problems occurred contemporaneously with Christopher's being out of a continuous school setting for the first time in six years, and that they evidence a need for a continuous education.

### Keith Jenny

Keith is also a severely retarded child who attends ECC in Savannah. As did Christopher, Keith exhibited an increased frequency of behavior problems over the summer of 1979. His problem included head-banging, picking his nose and gums until they bled, and intentional vomiting. Plaintiffs contend that Keith's maladaptive behaviors were caused by a lack of the constant training and attention he received while in school, and that they evidence a need for an extended school year.

### Anthony Jackson

Anthony Jackson is also a severely retarded child attending ECC in Savannah. Anthony's father testified that over the summer of 1979 Anthony's self-feeding skills deteriorated and he showed an increased frequency of toilet accidents. The plaintiffs' contend that Anthony's decreased skill level was caused by the interruption in programming, and that he exhibits a need for an extended school year.

Based on the above evidence, the plaintiffs contend that Russell Caine and the other identified members of the class exhibit a need for schooling in excess of 180 days, and request that this court order the local defendants to provide it.

### 2. Defendants' Evidence

The defendants also produced a considerable amount of evidence on the subject of regression, including testimony by expert witnesses and by teachers and aides who actually worked with the children enrolled at ECC. The teachers' and aides' testimony was uniformly that no regression was found in Russell or any other members of the class enrolled at ECC as a result of the 1979 summer break. Some staff members of ECC testified that many of the children enrolled actually showed progress in many skilled areas at the end of the 1979 break. The testimony of the ECC staff members was based on their observation of the children and heavily depended on an assessment study developed and carried out by the local school system. This study, known as the "portage," constituted defendants' main line of attack upon plaintiffs' claim of regression and consisted of a unique and novel application of the Portage Guide to Early Education. The portage is primarily a teaching tool and is a checklist of over 500 skills to be performed by children; it is designed to be administered to students with a developmental age of up to six years and grades children on the number of skills they can master. Primarily intended to be used in determining what skills a child has and what skills remain to be taught, it is undisputed that the portage was not designed to measure a child's developmental age.[13]

Although the portage was already being used in the Savannah-Chatham County school district in 1979 to evaluate skills, the local defendants began to use it during that year to assess the progress of PSMR students in the district. The test was administered to the 28 PSMR children in the Savannah-Chatham County school district and the results were compiled and analyzed. Members of the ECC staff who participated in the study testified that based on their findings, only one child regressed over the summer of 1979. They testified that this particular child regained his lost skills within a week and made substantial progress during the course of the year. The ECC staff members further testified that all other children tested on the portages showed varying degrees of progress over the summer of 1979. The defendants argued that the results of the portage study and evaluation, which were introduced into evidence by way of oral testimony and documents, constituted empirical evidence and refuted plaintiffs' regression claims. Defendants also contend that the results of the portage evaluation of the PSMR children in question were due more weight than expert testimony on regression, which was basically theoretical in nature.

The court has carefully considered and weighed the evidence presented by defendants based on the specific use made of portage tests and the results obtained. The court is compelled to find, however, that the portage studies' assessments and evaluations of PSMR children are of doubtful probative value on whether or not the children regressed during the summer of 1979. The portage was designed to be a teaching tool rather than a method of assessing a child's mental ability or educational progress. Moreover, the administration, testing, and analysis of the portages were inconsistent in pattern and methodology. Nor have the portages been certified or validated for the purposes for which they were used by members of the ECC, i. e., to evaluate the children involved and compile the data testified to in the instant case.

---

**13.** The application and results of the portage study described below apparently were developed in consultation with Dr. Keith Turner, an educational expert retained by the defendants during the course of the preparation for the trial of this case. Dr. Turner, a well-recognized authority in this area, was offered as the principal expert defense witness at the trial. Dr. Turner has testified in other major cases, including the district court trial in *Battle v. Commonwealth of Pennsylvania*, 629 F.2d 269 (3rd Cir. 1980).

The defendants advanced three specific theories why summer vacations are advantageous to PSMR children, this evidence being presented primarily by way of expert testimony. The first is the "battery recharge" or "burned-out" theory. Defendants contend that after nine months PSMR children, as well as their teachers, tend to become tired and bored with the structured environment of the ECC school program, and that a break is needed in order for them to be motivated. They contend that the children return to school after such a break "charged up" and more highly motivated to participate and perform. The second theory advanced by defendants was that the summer vacation allows PSMR children an opportunity to obtain a valuable informal education not available in the structured environment of the school. It is maintained that this informal education is just as important in a child's total development as the educational program received at the school. Thirdly, the defendants theorized that the summer vacation allows PSMR children an opportunity to benefit from a generalization process, that is, affording them the opportunity to transfer skills learned at school to the home environment. Defendants contend that these skills are more valuable once a child learns to use them in everyday living.

On the subject of whether behavioral problems are caused or exacerbated by a break in summer programming, defendants state that such problems should be treated where they occur, in the home. Defendants urge that the difficulties are medical in nature and outside the scope of school system's obligations.

There is disagreement between the parties regarding mentally retarded children's needs for speech and physical therapy on an extended basis. Plaintiffs contend that many PSMR children require continuing physical and speech therapy, necessitating provision for such services beyond the 180 days provided for in the Savannah-Chatham system. Defendants dispute this and contend that any such speech and physical therapy needs can and should be carried out in a home program during the summer. They offered evidence that this had been done successfully in the Savannah-Chatham district. Defendants also argue that these needs are in any case basically medical in nature and not the primary obligation of the school system.

### 3. The Court's Findings

The contentions asserted and evidence presented on the question of the effects of breaks in programming has been carefully reviewed and weighed by the court. The evidence has mainly dealt with the subject of regression and to a lesser extent the related subject of recoupment of skills.

As would be expected in a case of this nature, a barrage of expert testimony has been presented by both sides on various aspects on the question. The defendants also offered testimony on the results of portage studies of the children involved. Although the court does not find that the portage studies are without weight or value, it does discount their probative value on the issue of regression, as pointed out above. As to the conflicting testimony of parents and ECC staff personnel, while it has probative value on the issue involved, all of this testimony must be weighed and evaluated in the light of the witnesses' proximity to the problems involved in this case and the issues being litigated. One fact that is of considerable interest to the court is that all of the members of the staff of ECC who appeared testified uniformly that none of the PSMR students who were evaluated regressed during the summer of 1979. This testimony conflicts with other evidence in the case and a belief, common among educators, that as a general rule all school children have regression and recoupment problems due to the three months of the summer vacation.

With regard to the weight to be accorded the various testimony adduced at trial, it cannot be overlooked that the parents are strong advocates for twelve months of instruction for their children. As defendants pointed out, some parents may wish the school systems to take total responsibility for the care and education of PSMR children. The court has also borne in mind

that teachers are accustomed to a nine-month education period. It is also important that the teachers have been trained in the area of special education and possess more expertise in this regard than most parents. In this connection, the court was impressed with a statement by Anthony Jackson's father to the effect that a particular teacher could get Anthony to respond in ways that the parents could not.

The court does not accept the defendants' contention that behavioral problems and speech and therapy needs are not the obligation of the educational system. Treatment of these types of problems in many cases may be a part of a child's special education program, or may be necessary in order for a particular child to benefit from its education. The Handicapped Act's definition of related services indicate that the treatment of such problems was contemplated for handicapped children, including the mentally retarded. Further, some of the services already provided by the state school system encompass this type of need.

■ The evidence presented on the degree of regression suffered over the summer by the individual child plaintiffs was inconclusive. While the court rejects altogether defendants' assertion that no regression took place, it remains unconvinced that the mandatory injunction sought by the named children, which would order them to be given summer schooling, should issue. The bulk of evidence showing a likelihood of regression applied to retarded children in general and was not tied to the individual child plaintiffs. That which did address the children's individual regression came primarily from their parents, who are also parties to this action. Overall, the evidence presented was not conclusive enough to justify the issuance of the mandatory injunction. This is not to say that the individual child plaintiffs cannot show at the administrative level that a longer school year is dictated, but merely that they have not done so in this case because the evidence presented was more generally applicable to the class as a whole. The requested injunction must be denied.

The court has found that defendants have policies prohibiting the consideration or provision of school years longer than 180 days, which means that these children have never had their individual needs for longer school years evaluated. As discussed below, see pages 1281–1283 *infra*, the court is of the opinion that these individualized determinations should be made in the first instance by the defendants. If the children's needs are considered without the inhibiting limitation of the 180-day policy, it is entirely possible that they will be found to require more than 180 days of school.

### III. Conclusions of Law

#### A. The 180-Day Policy and the Handicapped Act

The Education for All Handicapped Children Act ("Handicapped Act"), 20 U.S.C. §§ 1401 *et seq.* (1976), provides financial assistance to states in furnishing educational services to handicapped children. The receipt of federal monies, however, is not without its price. The Handicapped Act imposes certain duties and obligations upon states which must be performed in order to continue the flow of funds. Generally, the Handicapped Act requires all states receiving funds thereunder to effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). 20 U.S.C. § 1401(18) defines "free appropriate public education" as:

> Special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the state educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the state involved, and (D) are provided in conformity with the individualized education program required under § 1414(a)(5) of this title.

The Handicapped Act defines "special education" as a program of instruction which is specially designed "to meet the *unique* needs of a handicapped child," free of charge to the parents or guardians of such

child. 20 U.S.C. § 1401(16) (emphasis added). "Related services" are those supportive services which may be necessary for a certain handicapped child to benefit from the special education he is to be provided with. *Id.* § 1401(17).

An appropriate education for each child is generally determined by that student's "Individualized Education Program" (IEP). An IEP is a written statement for each handicapped child which is developed at a meeting between the child's parents, teacher, and a qualified representative of the school board or agency that is to provide services for that child. The IEP is required to contain a statement of the child's present level of performance, a statement of goals and objectives for that child, a statement of specific services to be provided to the child, the projected date for the commencement of such services, and the anticipated duration of the services. The IEP should also contain some neutral criteria for determining whether the child's objectives are being achieved, and should be reviewed and revised where appropriate on a periodic basis. *Id.* §§ 1401(19) & 1414(a)(5). The IEP is the key to determining what services a child needs, and with what services he will be provided.

In addition to the substantive provisions set forth above, the Handicapped Act provides certain procedural safeguards to insure the provision of a free appropriate education for each child. The parents have the right to examine all relevant records pertaining to the placement of their child in order to obtain an independent evaluation of the child's educational needs. Parents are entitled to written, prior notice of any proposed or refused change in their child's program, and have the right to complain about any matter relating to the provision of a "free appropriate public education" to their child. If a complaint is filed as provided in the Handicapped Act, the parents or guardian have the right to an impartial due process hearing before a person not employed by the agency or unit which is to provide education or care for the child. *Id.* § 1415(b).

If the hearing is conducted by a local district, an aggrieved party has the right to appeal any final decision to the state educational agency, which is required to conduct an impartial review of the local hearing. *Id.* § 1415(c). Any person aggrieved by a final decision of the state educational agency has the right to bring a civil action in state or federal court with respect to any complaint that has been filed. *Id.* § 1415(e).

From the above discussion it is clear that the Handicapped Act places an emphasis on the individual needs of a particular handicapped child. "Special education" is defined in terms of what is necessary to meet a handicapped child's unique needs. The provision of "related services" is also individual-oriented since a supportive service necessary for one child might not be required for another. Further, "related services" by definition includes "the early identification and assessment of handicapping conditions in children." *Id.* § 1401(17). This is also an individual-oriented function, particularly in light of the broad range of handicaps covered by the Handicapped Act. *Id.* § 1401(1). Also, the procedural safeguards make sure that the individual needs of each child are fully considered and provided for.

█ The Handicapped Act's emphasis on the individual child is most clearly shown by the requirement of an IEP. The conference preceding the IEP is designed to consider a child's specific needs, including the development of reasonable goals and objectives for the child. The IEP is to be based upon those considerations. There can be no doubt that the function of the IEP is to develop a plan of education appropriate to the particular needs of each handicapped child. This court concludes that the Handicapped Act requires that full consideration be given to the individual educational needs of each child in the development of a program for that child. To the extent that a state has a policy which prohibits, or even inhibits, such full consideration, the court is of the opinion that such policy constitutes a violation of the Handicapped Act.

The Handicapped Act places the ultimate responsibility for compliance on the state

educational agency. 20 U.S.C. § 1412(6) provides:

> The state educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency.

Section 1414(d) of the Handicapped Act states that whenever a state educational agency determines that a local education agency is, for various reasons, not providing programs of free appropriate education, "the state educational agency shall use the payments which would have been available to such local educational agency" to provide an appropriate education directly to the handicapped children in the area served by the local agency.

 The court concludes that the above-discussed provisions of the Handicapped Act clearly places the responsibility on the state educational agency to make sure that local agencies provide adequate educational services to handicapped children, or to provide directly such services themselves.

 The court must now determine whether the defendants' policies violate the provisions of the Handicapped Act. In light of the Handicapped Act's clear emphasis on the individualized needs of each child, as discussed *supra*, the court concludes that an across-the-board policy prohibiting the consideration of a child's needs beyond 180 days violates the Handicapped Act, as does a policy limiting the provision of schooling to 180 days. A policy limiting schooling regardless of individual needs contravenes the defendants' obligation to make a case by case determination. Such a policy assumes that no child needs more than 180 days, without any individual consideration.

The defendants argue that the language of the Handicapped Act, the regulations promulgated thereunder, and the legislative history indicate a congressional intent that handicapped children only be provided the 180 days of schooling traditionally provided to normal children. This court disagrees. It is well settled that the starting point in the construction of any statute is its language. *See, e. g. Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed. 980 (1979). As discussed above, the language of the Handicapped Act clearly indicates that an emphasis should be placed on the individual needs of each child in developing an educational program for that child. A policy which prohibits such individual consideration clearly violates the provisions and intent of the Handicapped Act. The clarity of the statutory language obviates any need to consider the agency interpretation or legislative history. *See, e. g., Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Glenn v. United States,* 571 F.2d 270 (5th Cir. 1978).

The court concludes that the Handicapped Act places responsibility on defendants to fully consider the individual needs of all handicapped children. As the 180-day policy prohibits or at best limits individual consideration of the needs of each child it must be discontinued. In the case of the state defendants, the manifestations of the policy include a refusal to require local school districts to consider or provide for schooling in excess of 180 days, a refusal to pay for schooling in excess of 180 days, and a failure to fully consider the needs for excess programming in cases that have been appealed to it.

There can be no question that the defendants must provide schooling in excess of 180 days for any child that may need it. The Handicapped Act's mandate in this regard is clear. The state and local defendants have a *joint obligation* to provide each handicapped child with an appropriate education, with the ultimate responsibility for such provision falling on the state. If a particular child is determined to need schooling in excess of 180 days in order to have a "free appropriate public education," the defendants are obligated to provide it.

The conclusion in this case is supported by the holding of the Third Circuit Court of Appeals in *Battle v. Commonwealth of Pennsylvania*, 629 F.2d 269 (3rd Cir. 1980). In *Battle*, the court was faced with the question of whether or not an administrative policy of Pennsylvania which set a limit of 180 days of instruction per year for all children violated the Handicapped Act.[14] After reviewing the relevant facts and the provisions of the statute, the Third Circuit concluded Pennsylvania's policy to be "incompatible with the Act's emphasis on the individual." 629 F.2d at 280. The court further held that "the 180 day rule imposes with rigid certainty a program restriction which may be wholly inappropriate to the child's educational objectives." *Id.*

Unlike the defendants in *Battle*, the instant defendants contend that they have no policy prohibiting the consideration of a child's needs for schooling in excess of 180 days. However, after consideration of all the facts, the court has conclusively found that such a policy does exist on the part of both local and state defendants. The issue in this case regarding the policy therefore becomes the same as was faced in *Battle*, and the same result is reached.

Further support is drawn from *North v. District of Columbia Board of Education*, 471 F.Supp. 136 (D.D.C.1979). In *North*, the Court had to decide whether a severely handicapped sixteen year old epileptic needed to be placed in a residential facility and, if so, whether the District of Columbia Board of Education was responsible for providing for that placement. The defendants contended that the child's needs were medical in nature, and that his educational needs could be adequately attended to without residential placement. The court decided that the child's emotional and educational needs were closely interwoven, and that residential placement by the Board of Education was required. The Court entered a preliminary injunction to that effect. Although there are some obvious factual distinctions,[15] this court is of the opinion that the decision in *North* is supportive of the conclusion reached in the case at bar. The district court found that the Handicapped Act placed an obligation on the defendant school board to provide for a child's needs even though they differed from those of a normal child. Similarly, this court finds that the Handicapped Act places an obligation on defendants to consider and provide for the needs of handicapped children under its jurisdiction, even if such needs differ from those of normal children.

**B. The 180-Day Policy and Section 504**

The defendants argue that Section 504 of the Rehabilitation Act of 1973 ("Section 504") is inapplicable in the instant case. They contend that Section 504 does not place a duty on recipients of federal funds to act affirmatively and cite *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) as authority. Further, it is their position that the Handicapped Act, as a more recent and specific statute, supersedes Section 504 on the question of education for handicapped children, and that the two acts should not be simultaneously applied in this case. The defendants also contend that Section 504 does not provide a private right of action for programs other than those pertaining to employment, and that since it prohibits discrimination, they are not in violation of Section 504 because the plaintiffs in this case are not being excluded from educational programs. They argue that the plaintiffs are seeking benefits that are not received by normal students, and that the intent of the Act was simply to prevent plaintiffs and children like them from being entirely excluded from the system. Since there is no exclusion or discrimination, defendants urge that Section 504 does not apply.

After careful consideration of this matter, the court concludes that Section 504 is applicable to the plaintiffs' claim, and

---

**14.** For an exhaustive discussion of the facts in *Battle*, see the well-written opinion of Judge Newcomer in *Armstrong v. Kline*, 476 F.Supp. 583 (E.D.Penn.1979).

**15.** *North* involved one student rather than a class action, and was concerned with a residential placement instead of the 180-day question.

that the defendants' refusal to consider the educational needs of handicapped children beyond 180 days violates Section 504. Section 504, 29 U.S.C. § 794, reads as follows:

No otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, solely by reason of his handicap be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulations shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take affect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

It is clear that Section 504 prohibits a handicapped individual from being denied the benefits of an educational program which receives federal financial assistance. This language shows that the congressional intent was not merely to prohibit the denial of access to such programs, but also to give handicapped persons an opportunity to enjoy the benefits of, and have access to, such programs. It indicates that special treatment or additional services may be necessary for the handicapped person to fully enjoy the benefits of his education. Mere access to conventional education may not be sufficient. If Congress had intended only to prohibit the denial of access to federally funded educational programs, it could easily have done so.

The United States Supreme Court has recognized that equal access may not always be enough to provide equal opportunity. In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 37 L.Ed.2d 1 (1974), a case brought under Title VI of the Civil Rights Act of 1964, the court upheld the right of Chinese children to have bilingual instruction. The court held that "there is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education." 414 U.S. at 566, 94 S.Ct. at 788. The court stated that it was "obvious that the Chinese-speaking minority received fewer benefits than the English-speaking majority from respondents' school system ..." 414 U.S. at 568, 94 S.Ct. at 789. The court held that such receipt of different benefits constituted discrimination, and required that some relief be fashioned so that Chinese-speaking children could benefit from the school system.

Although brought under a different statute, the same reasoning is applicable in this case. Just as some special treatment was necessary for the Chinese-speaking students in *Lau* to enjoy the benefits of their education, some special treatment may be necessary for handicapped children to benefit from theirs. If a child needed a special service to gain equal benefit from his education, the denial of that service would constitute discrimination in violation of Section 504. Individual attention to the needs of each handicapped child is the only way to determine whether such special or additional services are needed.

Regulations promulgated pursuant to Section 504 support the above interpretation. 34 C.F.R. § 104.33 requires recipients of federal funds that operate public elementary or secondary school programs to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 105.33(a). Appropriate education is defined as regular or special education designed "to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met ..." 34 C.F.R. § 104.-33(b)(1). Pursuant to 34 C.F.R. § 104.-33(b)(2), implementation of an IEP developed in accordance with the Act is one way of providing education that meets the indi-

vidual needs of handicapped children. The regulations discussed above readily indicate the necessity for individualized attention to the needs of handicapped children. There can be no doubt that they, as does the Handicapped Act, place an emphasis on the individual.

A similar conclusion was reached in *Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex. 1978). There the court held that Section 504 "places upon school districts . . . the duty of analyzing individually the needs of each handicapped student and devising a program which will enable each individual handicapped student to receive an appropriate, free public education." 459 F.Supp. at 1191. The court therefore entered an order enjoining the defendant school district from preventing the handicapped plaintiff from playing football during the school year in question. This court agrees with the court in *Doe* that Section 504 places a duty on school districts to individually consider the needs of each handicapped student within its jurisdiction.

The defendants' contention that Section 504 only provides a private right of action in cases involving employment is clearly not the law in this circuit. In *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1981), the court allowed a deaf graduate student to bring a private right of action under Section 504 to challenge the denial of interpreter services by the University. After *Camenisch,* it is clear that in this circuit, a private right of action under Section 504 is proper in cases other than employment cases.

The defendants' position that the Act supersedes Section 504 and that they should not be jointly applied is similarly without merit. In *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir. 1980), the court held that failure to provide catheterization services for a handicapped child violated both the Handicapped Act and Section 504. Also, in *S–1 v. Turlington,* 635 F.2d 342 (5th Cir. 1981), the court held, *inter alia,* that the expulsion of handicapped students from school without consideration of whether or not the students' misconduct was related to their handicapped condition violated both

the Handicapped Act and Section 504. In both *S–1* and *Tatro,* the Fifth Circuit applied the Handicapped Act and Section 504 together.

The defendants' reliance on *Southeastern Community College v. Davis, supra,* is misplaced. As the Fifth Circuit stated in *Camenisch, supra,* "the Supreme Court's decision in *Southeastern Community College* says only that Section 504 does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefits of the training." 616 F.2d at 133. The case sub judice is clearly distinguishable from *Southeastern Community College* because the instant plaintiffs will realize the principal benefits of their training.

*Southeastern Community College* is also distinguishable in that it involved a postsecondary educational institution and required the interpretation of a different set of implementing regulations than those at bar. In *Southeastern Community College,* the Supreme Court interpreted Subpart E of the regulations entitled "Post Secondary Education." The regulations involved in this case are contained in Subpart D which is entitled "Pre-school, Elementary and Secondary Education." Requirements and definitions applicable under one part may not be applicable under another.

The court concludes that Section 504, in conjunction with its implementing regulations, requires a recognition of the individual needs of all handicapped children by educational programs or systems which receive federal funds. Because the defendants' 180-day policy prohibits the individual consideration of children's needs, it violates Section 504.

### C. Provision of Extended Programs to Specific Children

Plaintiffs also seek an order requiring the defendants to provide extended school year programs for Russell Caine and other identified members of the class. In view of the court's finding regarding the effects of breaks in programming, the mandatory re-

lief requested cannot be granted. While there is evidence in this case which indicates that there may generally be a need for extended school programs for PSMR children, it does not clearly show that any particular PSMR child identified in this case is in need of an extended year. Absent a showing or immediate irreparable harm, injunctive relief—particularly mandatory injunctive relief—is inappropriate. *See* 11 *Wright and Miller, Federal Practice and Procedure* § 2942 at 377.

As the court has noted above, the defendants have never considered the needs of Russell Caine or the other individual children for schooling longer than 180 days. The evidence clearly showed that at the time the IEPs were developed for these children, the agents or employees of the defendants who participated in their formulation deemed that the school year had to be limited to 180 days. In fact, the defendants' policies had effectively placed such a limit on the school year. Although the State Board of Education, in its decision on Russell Caine's appeal from the decision of the local board, found that Russell did not have a need for 180 days, the decision of the lower board was clearly grounded on the fact that the state would only fund schooling for 180 days. The local hearing officer actually found that there was some evidence of a need for extended schooling for Russell Caine but felt that the local board was only obligated to provide 180 days.[16] In light of the above, it appears clear that the needs of Russell Caine or any of the other children for schooling in excess of 180 days were not considered.

The court is of the opinion that the individual determination of need should be made in the first instance by the state and local defendants. As the court noted in *Battle v. Commonwealth of Pennsylvania, supra*, the Handicapped Act contemplates this. This is most clearly evidenced by its requirement that the state develop plans for providing free appropriate public education, and its provision that personnel of local and state educational agencies are primarily responsible for the formulation of a child's IEP. The tradition of local control of educational policy and decisions is long-standing. *See Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Note, *Enforcing the Right to a "Appropriate" Education: The Education for All Handicapped Children Act of 1975*, 92 Harv.L.Rev. 1103 (1979). Also, it should be noted that the difficulty of such decisions demands that they be made in the first instance by local officials with more specialized knowledge and expertise in the area. *See Battle v. Commonwealth of Pennsylvania, supra.*

In sum, the court concludes that the determination of whether any mentally retarded child needs more than 180 days of schooling is a burden that the defendants (not the plaintiffs) must carry in the first instance, i. e., in the IEP process. *See S–1 v. Turlington*, 635 F.2d at 349.[17]

Therefore, the court declines to require the defendants to provide the named plaintiff or any other member of the class specific extended school programs. However, the court will order the defendants to consider the named plaintiff and all other handicapped children's needs without limitations. Although the court has concluded that the child plaintiffs' individual needs for a longer school year have not truly been considered, it would be manifestly inappropriate for the court to attempt to make such specialized educational determinations without first permitting the state and local defendants to reconsider their findings in light of this order.

---

**16.** See note 3, *supra*.

**17.** In *S–1 v. Turlington, supra*, the court was faced with the question, *inter alia*, of whether the Handicapped Act and Section 504 placed the burden of raising the question of whether a student's misconduct was a manifestation of the student's handicap on the state or on the student. The court made the following conclusion: "In light of the remedial purposes of these statutes, we find that the burden is on the local and state defendants to make this determination." 635 F.2d at 349.

In reaching the above decision, the court is mindful of the possibility that the inevitable is merely being postponed. The Handicapped Act provides federal and state judicial review of individual educational programs when appeals are initiated, which might very well require this court to evaluate the substantive contents of educational programs of individual children after the educational officials have acted.[18]

D. *Violations of State Law and the United States Constitution*

The plaintiffs have alleged that the policies of the defendants violate various provisions of the United States Constitution and state law. For the reasons discussed below, the court will not decide those claims.

■■■■ Plaintiffs seek to invoke this court's pendent jurisdiction to review its claim under the Adequate Program for Education in Georgia . Act, *Ga.Code Ann.* § 32–601a *et seq.*, and other relevant state law. It is well established that the exercise of pendent jurisdiction lies in the discretion of the court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Gregory v. Mitchell*, 634 F.2d 199 (5th Cir. 1981). As this case involves novel interpretations of state law and state constitutional provisions, the court is of the opinion that those interpretations should be made by state courts in the first instance. *See, e. g., United Services Life Ins. Co. v. Delaney*, 328 F.2d 483 (5th Cir. 1964), *cert. denied* 377 U.S. 935, 84 S.Ct. 1335, 12 L.Ed.2d 298. The court therefore declines to exercise pendent jurisdiction over the state claims.

With regard to the federal constitutional claims, the plaintiffs contend that the defendants' policies violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that these viola-

tions are actionable under 42 U.S.C. § 1983. In light of the disposition of this case under the applicable federal statutes this court need not address the constitutional claims, and indeed judicial restraint requires that they be left alone. The relief granted to plaintiffs in this case, requiring the defendants to give individual consideration to the needs of each handicapped child, is as complete as it could be under the circumstances. No order could properly issue extending the school year for any of the children absent a showing of a need for such extension.

E. *Motion for Recertification of Class*

The defendants have filed a motion for redefinition or recertification of the class. Specifically, the defendants request that: (a) the class be limited to profoundly or severely mentally retarded children as opposed to all mentally retarded children as set forth in the order of June 11, 1979; (b) that the class be limited to the PSMR children in Chatham County rather than being statewide in scope as is now the case; and (c) if the court allows the class to remain statewide in scope, that the local defendants be dismissed as unnecessary parties or that the remaining 186 school systems be added as indispensable parties.

■■■■ After careful consideration of the matter, the court concludes that redefinition of the class is not warranted. In July of 1979 Judge Murphy defined the class as including "all handicapped children of school age in the state of Georgia who are mentally retarded, and who, because of their special needs, require more than 180 days of public school programming ..." and their parents. That definition describes all persons who are entitled to and have received relief pursuant to this order. This order, in effect, requires the state de-

---

**18.** In *Battle*, the Third Circuit, after making a similar conclusion, commented as follows:

We recognize that by this decision we may merely be postponing the inevitable. The statute provides for federal and state judicial review of individual educational programs which have been appealed through the statutory procedure. *Id.* § 1415(e)(2). Thus it is quite possible that, in the future, we will be

called upon to evaluate the substantive content of educational programs developed under the Act. We are hopeful, however, that prior to that day the states, in cooperation with the Commissioner of Education will establish acceptable guidelines to aid in that most difficult decision.

629 F.2d at 281. This court shares that hope.

fendants to ensure that the needs of all mentally retarded children are considered without the limitations of the 180-day policy. If a child needs programming in excess of 180 days, this order requires the state defendants to see to it that such additional programming is provided. Consideration of and provision for a mentally retarded child's individual needs is mandated by the Handicapped Act, regardless of whether the child is mentally retarded or PSMR. While it might be true that PSMR children are more likely to need extended programs, other mentally retarded children have the same right to have their needs considered; if they need extended programs, they have a right to have them provided. Since the defendants' policies violate the rights of all mentally retarded children, and since the relief granted in this order, an injunction against the continuation of that policy, will inure to the benefit of all mentally retarded children, the court concludes that the class need not be limited to PSMR children but that it can include all mentally retarded children.

The court also disagrees with the defendants' contention that the class should be limited to children in Chatham County. The state defendants' policy of refusing to consider or provide for the needs of a child for schooling in excess of 180 days violates the rights of all mentally retarded children in the state of Georgia under the Handicapped Act. That being the case, the state defendants must be required to discontinue the policy for all children in the state rather than just those in Chatham County. It would not be logical to allow the state to continue an illegal policy elsewhere in the state. Accordingly, the court concludes that the class should include all mentally retarded children in the state of Georgia.

■ The court disagrees with the contention of the local defendants that they should be dismissed as parties to this action because their participation is unnecessary to afford complete relief to plaintiffs. Although their discontinuation of the policy will not have statewide effect, it is proper to require them to discontinue the policy as to that portion of the class that resides in Savannah-Chatham County. Since the local defendants have no responsibility for providing services to members of the class other than those in their school district, they will not be prejudiced by being required to remain in the lawsuit. Fed.R.Civ.P. 20(a) governs when parties may be joined as defendants in one action and provides in part that persons may be joined as defendants in a single action

> if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded.

It is clear that the local defendants are proper parties to this action under Fed.R. Civ.P. 20(a) and need not be dismissed.

■ The court also disagrees with the defendants' contention that the remaining 186 local educational agencies are indispensable parties. Under Fed.R.Civ.P. 19, a party must be joined if

> ... (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Fed.R.Civ.P. 19(a). The court is of the opinion that complete relief can be accorded among the defendants who are already parties to this action. In requiring the state defendants to make sure that the needs of all children for education beyond 180 days are considered, the court is affording complete relief. The state defendants have a responsibility under the Handicapped Act to make sure that such needs are considered and provided for and must do so even if the local educational agency has no programs

for mentally retarded children. By requiring the state defendants to carry out their obligation under the Handicapped Act, complete relief will be afforded to the plaintiff class. Since no order is being entered against the remaining 186 local school districts, their ability to protect their interest in this matter will not be impeded or impaired. The state defendants can make sure that all children's needs are considered by requiring the local agencies to consider such need or by considering such need themselves. The only effect that this order will have on local agencies is indirect, and the court concludes that the remaining 186 local educational agencies are not indispensable parties and need not be joined. *See Arias v. Wainwright*, 28 F.R.Serv.2d 483 (N.D.Fla.1979).

F. *Motion to Dismiss Individual Defendants*

■ The local and state superintendents and members of the boards of education were sued in their official and individual capacities. The individual local defendants have filed motions to be dismissed from this cause. Having found no abuse of discretion and no acts in excess of their authority, the court concludes that the individual defendants should be dismissed from this action in their individual capacities. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Fowler v. Cross*, 635 F.2d 476 (5th Cir. 1981). However, the court finds it appropriate that the individual defendants remain in the action in their official capacities.

Further, it will be ordered that all of the individual defendants who no longer hold the public office that they held at the time this action was instituted be dismissed from this case, and that their successors in office be substituted therefor. Fed.R.Civ.P. 25(d)(1).

All motions not specifically addressed or ruled on above will be denied as moot.

## IV. Relief Granted

A. *Declaratory Relief*

It is the judgment of this court that the policies of the defendants that prohibit the consideration and provision of schooling for mentally retarded children in excess of 180 days violate both the Education for All Handicapped Children Act ("Handicapped Act"), 20 U.S.C. § 1401 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. These policies prevent handicapped children from receiving the individualized attention to their needs that is mandated by both statutes. It is violative of these statutes to fail to consider whether a particular child needs schooling in excess of 180 days, and to fail to provide such excess schooling if needed.

It is further the opinion of the court that the defendants have an obligation to provide speech therapy, physical therapy, psychological services, and whatever other supportive services are necessary for children to benefit from their educational programs. Such services clearly fall within the definition of related services under the Handicapped Act, and must be made available as part of the state's obligation to provide a free appropriate public education. The provision of such services is limited by statute, however, to those necessary to "assist a handicapped child to benefit from special education . . . ." 20 U.S.C. § 1401(17).

It has not been determined by this court that the mentally retarded children here involved are entitled to a declaratory judgment that the defendants are obligated to provide educational programs in excess of 180 days to specific children since there has not been a conclusive showing of need for extended programs.

In making the rulings outlined in this opinion, the court is mindful that lurking in the background are many other thorny problems that have not been dealt with, such as financial limitations and the possibility of overburdening available school personnel. These and other issues must eventually be addressed by a court or some other appropriate body in the future.

B. *Injunctive Relief*

1. *The Continued Application of the Policy*

In view of the above determination, the court concludes that the plaintiffs are enti-

**1286**

tled to the entry of an injunction against the continued application of the 180-day policy by defendants. The entry of injunctive relief is appropriate in the absence of an adequate legal remedy for plaintiffs' claim. *See Lewis v. S.S. Baune,* 534 F.2d 1115 (5th Cir. 1976); 11 *Wright and Miller, Federal Practice and Procedure* § 2944 (1973). Irreparable injury is one means of showing an inadequate remedy at law. In the instant case, it is clear that a continued application of defendants' policy prohibiting the consideration of or provision for a child's educational needs would work an irreparable harm on the plaintiff class. As long as that policy is in effect, the mentally retarded children in the plaintiff class will not receive the full individualized consideration to which they are entitled, and thus might not receive a "free appropriate public education." Neither money damages nor any other legal remedy would compensate for this loss.

The harm that would befall the children in the plaintiff class from a continued application of the policy outweighs any possible harm to the defendants from discontinuing the policy. Also, the public interest is more likely to be served by a discontinuation of the policy than by its continuation. Therefore, the court has concluded that the defendants should be enjoined from refusing to consider the needs of handicapped children for educational programming in excess of 180 days, and from refusing to provide such excess schooling if needed.

### 2. *Mandatory Injunction for Specific Children*

As discussed above, there has been no definitive showing of a need for an extended school year for any particular children. Since there has been insufficient persuasive proof of need, the threat of irreparable harm has not been sufficiently shown to merit injunctive relief. Accordingly, the court refuses to require extended programs at this time for any particular children and will allow the state and local defendants to make their evaluations.