**DAVID H., Through his parents and next friends John and Arlene H.**

v.

**SPRING BRANCH INDEPENDENT SCHOOL DISTRICT, et al.**

C.A. No. H–80–2739.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 5, 1983.

Sarah Scott, Brooklyn, N.Y., for plaintiffs.

Jeffrey A. Davis, Reynolds, Allen & Cook, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### Introduction

Plaintiffs, Arlene H., John H., and David H., brought this action pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1982), the Education for All Handicapped Children Act, 20 U.S.C. § 1401, *et seq.*, (1978), 42 U.S.C. § 1983 (1981), the Fourteenth Amendment to the United States Constitution, the Texas Education Code, and the Texas Administrative Code. Plaintiffs claim damages as a result of certain actions taken by defendants in 1975 and 1976, after which David was educated in private schools rather than in the Spring Branch Independent School District.

The cause was tried to the Court without a jury. At the conclusion of the trial the Court requested that the parties file additional legal memoranda and took the case under advisement. Pursuant to Rule 52(a), Fed.R.Civ.P., the Court hereby enters its Findings of Fact and Conclusions of Law detailing the reasons for its conclusion that plaintiffs should prevail on the merits and that the defendants are liable to plaintiffs for $24,259, plus interest at the legal rate.

### Findings of Fact

#### 1. Historical Narrative

1. David H. is a handicapped male student born November 15, 1963, who under Texas and federal law is classified as a learning disabled student. Admission of Fact 1. He has an older brother and an older sister who attended and graduated from Spring Branch Independent School District. Admission 16. David's mother, Arlene H., lived within the Spring Branch Independent School District at the same address during all times material to this lawsuit. Testimony of Arlene H.

2. In February 1975 plaintiff Arlene H. contacted the Spring Branch Independent School District regarding David. Admission 3.

3. The Spring Branch Independent School District arranged for David to have a psychological evaluation. Admission 4.

4. Ms. Dorothea Cooper, a Master's level child clinical psychologist employed by the Spring Branch Independent School District, evaluated David on September 17, 1975. In her written report, Ms. Cooper recommended: "Maintain [David] at Memorial Hall or similar private school. David's functioning is so low that if placed in a public school, he would have to be considered for inclusion in a class for the educable mentally retarded child [hereinafter "EMR"]." Admission 5.

5. Ms. Cooper recommended private rather than public schooling because no appropriate class existed in Spring Branch for David. Spring Branch had classes for EMR and for normal but slow learning students, but there was no middle ground for students like David who were classified as

learning disabled. Testimony of Dorothea Cooper.

6. Ms. Cooper explained this to Arlene H. at their meeting in September 1975, and, consequently, Arlene H. continued David's education at Memorial Hall for the 1975–1976 school year, along with a supplemental program at the Learning Development Center. Testimony of Dorothea Cooper and Arlene H. The total expenses for that year were $2864.[1]

7. On February 2, 1976, Arlene H. called the office of the Texas Education Agency (hereinafter "TEA") and spoke to Don Weston, the TEA director for program analysis in special education. In that conversation, Arlene H. expressed her interest in a public education for David, if appropriate, and also her need for help in finding a suitable program. Plaintiffs' Exhibit 6, PPS Routing Slip.

8. Weston referred the inquiry to Janie Fox Jones, chief consultant for the reorganization of special education, who undertook to investigate the matter. Ms. Jones called Dorothea Cooper, and the two discussed the matter for approximately an hour. Plaintiffs' Exhibit 6, Jones' Memo. Ms. Cooper then changed her opinion as to David's placement, and at the Admission, Review and Dismissal ("ARD") Committee meeting Ms. Cooper recommended that David be placed in an EMR class. At trial, she could not reconcile her change in recommendation. Testimony of Dorothea Cooper.

Shortly after the conversation with Ms. Cooper, Ms. Jones called Charlotte Lewis, assistant superintendent for special education at Spring Branch, Admission 26, who then contacted Arlene H. Ms. Lewis's responsive letter to Ms. Jones indicated that Arlene H. was interested in appropriate placement for David in Spring Branch. Plaintiffs' Exhibit 6, Lewis's letter 2/24/76.

After this sequence of events, it was Ms. Jones's opinion that "[p]erhaps, we need to talk about this one very soon." Plaintiffs' Exhibit 6, Jones' Memo.

9. In their telephone conversation, Ms. Lewis told Arlene H. that an ARD Committee meeting would be held to determine David's appropriate placement. The mother called every two or three weeks thereafter to learn whether such a meeting had been held. Finally, she learned, after the fact, that a meeting had been held on April 20, 1976, without either parent's presence, and that a recommendation had been made. Testimony of Arlene H. The ARD Committee suggested that David be placed in an EMR class to be watched closely and that in the event his functioning in the school setting became higher, he would be reconsidered for another program. The committee did not state which program might be reconsidered. Plaintiffs' Exhibit 1 at 728.

10. The mother rejected this recommendation, stating that her son was not mentally retarded. Plaintiffs' Exhibit 6, Pupil Services Contact Report.

11. Ms. Jones contacted Arlene H. again in June 1976 and understood from the conversation, erroneously, that David was enrolled in the Country School. Plaintiffs' Exhibit 6, Pupil Services Contact Report. In fact, David continued his classes at the Learning Development Center for the summer of 1976.

12. For the regular school year of 1976–1977, David attended the Patch School, a private school for normal children. He was given special instruction and did quite well. Testimony of Arlene H.; Plaintiffs' Exhibit 1 at 687–89, evaluation of Joan Anderson, Ph.D. The expenses for educating David during 1976–77 were $2240.[2]

13. In December 1976, Spring Branch closed its file on David and placed it in the

**1.** The following expenses were incurred during 1975–1976: payments to Memorial Hall—$1714, Plaintiffs' Exhibits 7–11, 13, 15–16, 85; psychological examination—$260, *Id.* 14; payments to the Learning Development Center—$775, *Id.* 12, 79, 81–84, 86, 87, 17, 88 (check numbers 2235, 2243, 2255 and 2288); payment to Brush Ranch—$25, *Id.* 88 (check number 2216); transportation—$90, *Id.* 1 at 751; testimony of Arlene and John H.

**2.** The following expenses were incurred during 1976–1977: payments to the Patch School—$1040, Plaintiffs' Exhibits 18–21, 23–26, 28, 30; psychological examination—$270, *Id.* 22; transportation—$930, *Id.* 1 at 749–50; testimony of Arlene and John H.

inactive files. Admission 29. The reason for the closing was that Spring Branch personnel believed the parents had voluntarily withdrawn their child from the district. Testimony of Jan Barnett. However, no evidence in the trial revealed correspondence to this effect from the parents to the defendants, only writings stating the educators' impressions of what Arlene H. intended. Plaintiffs' Exhibits 1 and 6.

14. No attempt was made after the file was closed to contact David or his parents, and there was no procedure to go through the closed files for a review, unless a person requested information from a file. Testimony of Don Weston and Jan Barnett. At the time the new educational laws began to take effect in 1977 and 1978, the school district did not have the personnel or the funds to expend the man hours required to examine all of the many closed files. Instead, they determined that it was best in the beginning to concentrate on the public awareness program. Testimony of Don Weston. Later a program was begun to go back through all of the closed files. Testimony of Lucinda Randall.

15. During the school year of 1977–1978, David was enrolled at the Trafton Academy, and the expenses for that year were $5395.[3]

16. In 1977 and 1978, Spring Branch began a major development in the area of education for the learning disabled, with programs for these students being greatly expanded. Admission 31. Further, twenty to twenty-five new teachers were hired that year with most of them being employed to teach the learning disabled. The term "learning disabled" came into being in 1978, and many students previously classified as "minimally brain injured" were placed in this category. Testimony of Lucinda Randall. However, none of these new developments were ever made known to Arlene H. by the defendants. Testimony of Arlene H.

17. In the same year, 1977, the TEA began a program of public awareness called "Child Find". This was for the purpose of finding handicapped children who were not receiving a free appropriate public education, and this was a continuing effort. The TEA used newspaper advertisements, television, radio, films, brochures, speeches—a general blitz to inform the public that more effective special education was available. Testimony of Don Weston.

Officials from Spring Branch contacted all private schools in the area, and brochures were mailed to Spring Branch citizens. Seven residential schools were visited, including Brush Ranch where David was enrolled. There is no explanation why he was not brought to the attention of the Spring Branch personnel. Testimony of Lucinda Randall. Officials spoke at meetings throughout the district, posted notices in public places, and even contacted pediatricians. Testimony of Jan Barnett. When parents of handicapped children were located, a publication called "Parents' Rights Handbook" was sent to them. Testimony of Lucinda Randall. Although Arlene H. lived in the Spring Branch district, no one ever contacted her specifically, and she never heard of the "Child Find" program. Testimony of Arlene H.

18. In the fall of 1978 David was accepted at a private residential school in New Mexico called Brush Ranch. This school is specially adapted for the learning disabled, and Arlene H. had attempted for some time to have David enrolled there. David studied at the Brush Ranch school for two years, but in the spring of 1980, the school notified his mother that they felt it would not be appropriate for him to return the next year due to his social immaturity. Testimony of Arlene H.; Plaintiffs' Exhibit 1 at 744. The cost for educating David for 1978–1979 was $10,401,[4] and the amount expended for the fall of 1979 was $3359.[5]

---

**3.** The following expenses were incurred during 1977–78: payments to Trafton Academy—$1565, Plaintiffs' Exhibits 31, 32, 34, 36, 39, 41, 43, 45, 48, 49; payments to the Learning Development Center—$1525, *Id.* 27, 29, 35, 42, 44, 50; psychological examination—$240, *Id.* 33, 52; special tutor—$1705, *Id.* 37, 38, 40, 46, 47;

transportation—$360, *Id.* 1 at 748; testimony of Arlene and John H.

**4.** The following expenses were incurred during 1978–79: payments to Brush Ranch school—$9600, Plaintiffs' Exhibits 51, 57–58, 60, 62–64,

**5.** See note 5 on page 1329.

19. David's parents became aware in the fall of 1979 of the legal rights of handicapped children through a seminar which David's father attended. It was not until a year later that they finally contacted Spring Branch again about a public education for David. The reason for their delay was concern that David might not be able to function in the public classroom, and they wanted an alternative placement in the event that the public education did not materialize in the fall of 1980. Further, they were not entirely sure of their legal rights. Testimony of John H. and Arlene H.

20. David spent one fall in 1980 at the Dallas Academy and then at last entered public school in the Spring Branch Independent School District in the spring of 1981. Testimony of Arlene H.

21. David is currently enrolled in defendant School District, and his current educational placement is not at issue in this case. Admission 2.

22. Spring Branch Independent School District is a recipient of federal funds for educational purposes. Testimony of Don Weston and Lucinda Randall.

### 2. Tests and Evaluations

23. David has been tested and evaluated no less than eight times during his school years.[6] None of these evaluations indicated mental retardation. Rather, it was a near unanimous conclusion that David demonstrated a significant discrepancy between his intellectual ability and his academic achievement. Battin, Plaintiffs' Exhibit 1 at 717; Cooper, *Id.* at 510; Myers, *Id.* at 707; Anderson, *Id.* at 689; Martinez, *Id.* at 507; Briggs, *Id.* at 515; and Blackman, *Id.* at 722. That is, he has greater capabilities than indicated by academic test results. This is most likely due to an organic brain impairment causing brain dysfunction. The problem is in processing information, and it is motorically related. Chao, *Id.* at 699; Battin, *Id.* at 717; Cooper, *Id.* at 512; and Martinez, *Id.* at 507.

24. David's greatest deficiency lies in the area of verbal functioning where he scored quite low: language, comprehension, reasoning, articulation, perception, expression. Chao, *Id.* at 699; Blackman, *Id.* at 722; Myers, *Id.* at 707; Briggs, *Id.* at 513; Anderson, *Id.* at 689; and Martinez, *Id.* at 507. However, in testing which utilizes abstract reasoning of a non-verbal nature, such as dividing patterns and reassembling them, David scored in the solid average range and slightly above. Blackman, *Id.* at 722; Anderson, *Id.* at 689; and Testimony of Dr. Martinez.

25. These test results indicate that David needs remedial work in reading, math, spelling, cursive writing, fine and motor functions and speech articulation. Myers, *Id.* at 707. He should be placed in a class of children with language problems. Anderson, *Id.* at 689; Testimony of Dr. Martinez. Moreover, he should be encouraged to achieve more and more difficult work. Myers, *Id.* at 707; Testimony of Dr. Martinez. In the Spring Branch Independent School District, these needs can be satisfied in a class for the learning disabled. Briggs, *Id.* at 515.

26. The term "learning disability" is usually associated with some type of disorder, and very often this disorder is a processing problem in the brain. There will be considerable variance in the scores for children falling in this category. In some areas, they may score below 70, and in others,

---

66; hotel and car rental—$157, *Id.* 53, 54; transportation—$644, *Id.* 55, 56, 59, 61, 65; testimony of Arlene and John H.

**5.** The following expenses were incurred in the fall of 1979: payment to Brush Ranch for fall tuition—$3250, Plaintiffs' Exhibit 68; transportation—$109, Plaintiffs' Exhibit 67; testimony of Arlene and John H.

**6.** The tests and evaluations were performed as follows: Dr. Dora Chao, M.D., November 1968; Dr. R. Ray Battin, Ph.D., March 1973; Dr. Stanley N. Myers, O.D., August 1975; Mrs. Dorothea H. Cooper, Child-Clinical Psychologist, September 1975; Ruth Blackman, M.A., March 1976; Dr. Joan S. Anderson, Ph.D., May 1977; Mrs. Patricia Martinez, Ed.D., August 1980; and Josephine Briggs, School Psychologist, November 1980. Plaintiffs' Exhibit 1.

above 100 (which is average). Testimony of Dr. Martinez.

27. Mentally retarded children do not have such variances, and they generally score sub-average in all areas of functions, revealing deficiencies in all phases of their development. The IQ score for the mentally retarded is below 70, and any child scoring below 70 in all categories is classified by the TEA as mentally retarded. These children have more limits on their development than do the learning disabled. Conversely, the child with a learning disability has generally greater capabilities than do the mentally retarded and can be helped to overcome many of the disabilities. Testimony of Jan Barnett and Dr. Martinez.

28. The type of education normally provided for the mentally retarded is not a strategic one but a diluted version of the regular program. The mentally retarded are given instruction in reading, but language is not the focus of their curriculum. It has more of what is called "hands-on" materials than texts for use in the classroom. The classes are fairly standardized because of the absence of the great variances in the scores of the educable mentally retarded. The main problem with these children is abstract reasoning. Testimony of Jan Barnett and Dr. Martinez.

29. A learning disabled child, on the other hand, needs more individualized programs because of the discrepancy in his potential and his actual achievement. The variability indicates greater strengths in some areas which need to be emphasized, and greater weaknesses in others which need to be remedied. On the whole, the learning disabled children have more capabilities to be tapped than do the mentally retarded. Testimony of Jan Barnett and Dr. Martinez.

30. In arriving at the above Findings of Fact, the Court has weighed carefully the credibility of the witnesses who have testified and finds that where significant factual conflicts exist, the plaintiffs' witnesses are more believable.

*Conclusions of Law*

1. The jurisdiction of the Court is based on 28 U.S.C. § 1331 (Supp.1982) and 28 U.S.C. § 1343 (1976).

### 1. Right to Recover Damages

2. A threshold issue in this case is whether the remedy of damages is available to the plaintiffs. The parties agree that the primary question for the Court is who is responsible for paying for the private schooling of David from the fall of 1976 to the spring of 1981, as plaintiffs do not contest the placement of David since January 1981. That being so, if there is no legal basis to allow the recovery of monetary relief, plaintiffs have no cause of action.

Plaintiffs base their claim for monetary relief on four legal theories: (1) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1982), (hereinafter "Section 504"); (2) the Education for All Handicapped Children Act, 20 U.S.C. § 1401, *et seq.,* (1978), (hereinafter "EHA"); (3) the Fourteenth Amendment to the United States Constitution and its companion remedy found in 42 U.S.C. § 1983 (1981); and (4) the Texas Education Code and the Texas Administrative Code (hereinafter "state law").

In the recent case of *Miener v. State of Missouri,* 673 F.2d 969 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), the Eighth Circuit held that damages are awardable under Section 504. *Accord, Monahan v. State of Nebraska,* 687 F.2d 1164 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983); *Gregg B. v. Bd. of Edu. of Lawrence School Dist.,* 535 F.Supp. 1333 (E.D.N.Y.1982); *Hutchings v. Erie City and County Library Board,* 516 F.Supp. 1265 (W.D.Pa.1981); *Patton v. Dumpson,* 498 F.Supp. 933 (S.D.N.Y.1980); *Poole v. South Plainfield Bd. of Ed.,* 490 F.Supp. 948 (D.N.J.1980). This precise issue has not arisen in any Fifth Circuit case, and in an action involving only injunctive relief the Fifth Circuit expressly reserved judgment on the question of damages. *Camenisch v. University of Texas,* 616 F.2d 127, 132 n. 10 (5th

Cir.1980), *vacated as moot,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A case from the Southern District of Texas, *Ruth Ann M. v. Alvin,* 532 F.Supp. 460 (S.D.Tex. 1982), ruled that damages are not recoverable under any of the theories urged in this case, but the *Ruth Ann M.* decision was made before the publication of *Miener.* The Eighth Circuit in *Miener* joined the Southern District of Texas as well as the Seventh Circuit in *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981), in holding that there is no recovery of damages under the EHA.[7]

■ Two of the District Courts which allowed damages under Section 504 limited the recovery to reimbursement of costs associated with private schooling. *State of Hawaii v. Katherine D.,* 531 F.Supp. 517, 529 (D.Haw.1982); *Gregg B. v. Bd. of Ed. of Lawrence School Dist.,* 535 F.Supp. 1333, 1340 (E.D.N.Y.1982). This position is supported by legislative commentary. In 1979, the Senate Committee on Labor and Human Resources reported a bill which would amend Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* to add the handicapped to the groups within its protections. The Committee stated:

> It is, and has always been the Committee's intent that any handicapped individual aggrieved by a violation of title V [within which Section 504 is contained] has the right under existing law to proceed privately in federal court to enforce the rights and remedies afforded under title V of the Rehabilitation Act of 1973, as amended, and to receive back pay and attorney's fees if successful.

S.Rep. No. 96–316, 96th Cong., 1st Sess. 12–13 (1979). It is a well-established principle that the post-enactment comments by Congress are cogent evidence of the intent of Congress at the time of its passage of a particular statute. This principle derives from the recognition that Congress is a credible interpreter of its own actions and that courts should pay heed to its interpretations. *See, e.g., Chrysler Corp. v. Brown,*

441 U.S. 281, 299–300 n. 29, 99 S.Ct. 1705, 1716–1717 n. 29, 60 L.Ed.2d 208 (1979); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969).

■ Accordingly, this Court is of the opinion that any damage remedy must be limited to recovery of costs expended for private schooling because of discrimination under Section 504.

3. The Court concludes that in accord with the above cited cases, damages as reimbursement for the expenses of private schooling are recoverable under Section 504 but not under EHA.

■ 4. With regard to damages for constitutional deprivations, the Court observes the general rule that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available. *Hagans v. Lavine,* 415 U.S. 528, 546, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974); *Frederick v. Thomas,* 419 F.Supp. 960, 971 (E.D.Pa.1976), *aff'd,* 557 F.2d 373 (3d Cir.1977). "If a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936). The Court has concluded, as explained below, that defendants are liable for money damages under Section 504, and it is therefore inappropriate to address the constitutional basis for damages since the issue has been disposed of by the statutory remedy.

■ 5. Finally, regarding damages for violations of the state's educational provisions, the Court has discovered no legal authority, nor have the parties cited any, on this basis for monetary relief. Accordingly, damages based on state law shall not be awarded in this case.

These conclusions as to damages narrow the opinion considerably, as Section 504 re-

---

7. *Anderson* found that in two limited circumstances damages might be assessed under EHA: one, where a child's physical health would be endangered, and, two, where the de-

fendant has acted in bad faith. Nothing in the evidence indicates that either of these instances was present during the relevant time periods. 658 F.2d at 1213–14.

mains the only viable route to recovery. For that reason, the analysis of liability will focus only on Section 504.

### 2. Scope of Review

■ 6. A second issue to be considered before delving into the substantive law is the extent of this Court's consideration of the administrative record and of the evidence presented at trial. Defendants contend that the trial cannot be a de novo review of the facts and, additionally, that due weight should be given to the hearing officer's decision denying plaintiffs' requested relief.

Defendants cite as legal support the recent case, Board of Education v. Rowley, —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), which dealt with issues under the EHA. First, it is important to note that the present decision is based solely on Section 504, a statute not considered for the pronouncements in Rowley. For that reason alone, this Court determines that Rowley does not control the question of scope of review in this case. But admitting that there are similarities in the language and purpose of the EHA and Section 504, the Court finds guidance in the philosophy of Rowley.

The Supreme Court recognized that Congress in enacting the EHA did not intend that the district courts were to substitute their own notions of sound educational policy for those of the school authorities which they review. With that admonition, the Court held that "due weight" should be given the state administrative proceedings. This Court agrees with the philosophy that district judges, untrained in psychology or education, should not pretend to know more about a student's welfare than professionals in the field who deal regularly with problems such as the one at hand. Accordingly, this Court is receptive to the findings and conclusions of the hearing examiner who is a professional in her field. However, the law is clear under Section 504 that no administrative proceeding is required before filing suit under this statute, Camenisch v. University of Texas, 616 F.2d 127, 134 (5th Cir.1980), vacated as moot, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); Miener v. State of Missouri, 673 F.2d 969, 978 (8th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), and, consequently, this Court is not bound by the outcome of a due process hearing brought under the EHA.

The hearing examiner recognized the distinction in her final decision: "Further complication results from the questionable jurisdiction of the Hearing Officer to consider matters arising prior to the passage of Public Law 92–142, [the EHA], which established the Impartial Due Process Hearing system." Plaintiffs' Exhibit 1 at 12. Moreover, the hearing officer relied only on the EHA regulations and stated no opinion as to money damages. "The Impartial Due Process Hearing cannot be used to track down past procedural defects which may or may not give rise to a civil claim for compensation. Another forum would be more appropriate for such determinations." Id. at 19. The hearing examiner recognized, rightly so, that monetary relief did not come within her sphere of authority.

7. Hence, the defendants' argument for restriction of review must be rejected, and all admissible evidence, as in any civil trial, will be considered for its proper purpose. The Court does, however, accord the weight which is due to the findings and conclusions, where relevant, of the hearing officer, a professional in the field of education.

### 3. Requirements Under Section 504

#### A. General Standards

8. Section 504 is briefly stated as follows:

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (Supp.1982). As is apparent from its language, Section 504 is intended to be part of the general corpus of discrimination law, and as such it is essen-

tially an antidiscrimination statute. *New York State Ass'n for Retarded Children v. Carey,* 612 F.2d 644, 649 (2d Cir.1979). Discrimination, at least in the context of racial discrimination, has taken on the connotation of unfavorable or unfair treatment because of the immutable characteristic. *McDonald v. Sante Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976). Consequently, the remedy for this form of discrimination has been the guarantee of equal rights and freedoms.

However, in view of the legislative and judicial history of Section 504, it is clear that with regard to the handicapped, this statute means more than equal access to education. A phrase in the statute contains the key word: benefits. No handicapped individual shall, solely by reason of his handicap, be denied the benefits of any federally financed program. The handicapped have a right to *equal benefits. Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex. 1978), *vacated as moot,* 622 F.2d 118 (5th Cir.1980), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981), although a decision granting a preliminary injunction, is instructive:

A review of the legislative history and the cases which illuminate § 794 [Section 504] reveal that this congressional enactment, for practical purpose, places upon school districts and agencies which receive federal funds, such as the defendants, the duty of analyzing individually the needs of each handicapped student and devising a program which will enable each individual handicapped student to receive an appropriate, free public education. The failure to perform this analysis and structure a program suited to the needs of each handicapped child, constitutes discrimination against that child and a failure to provide an appropriate, free public education for the handicapped child.

459 F.Supp. at 1191. The statute, then, does not merely prohibit the denial of access to federally funded programs but also gives handicapped persons an equal opportunity to enjoy the benefits of such programs. It indicates that special treatment or additional services may be necessary for the handi-

capped person to fully enjoy the benefits of his education, and mere access to conventional education may not be sufficient. *Georgia Ass'n of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263, 1280 (N.D.Ga. 1981) (rejected defendants' argument that the statute was simply to prevent the handicapped from being entirely excluded from the educational system.)

The often quoted statements of Senator Hubert Humphrey who introduced the bill into the Senate reveal the legislative intent that the handicapped are entitled to benefit from the federally funded programs.

I introduce ... a bill ... to insure equal opportunities for the handicapped by prohibiting needless discrimination in programs receiving Federal financial assistance.... These are people who can and must be helped to help themselves. That this is their constitutional right is clearly affirmed in a number of recent decisions in various judicial jurisdictions.

118 Cong.Rec. 525 (1972). The decisions to which Senator Humphrey referred are *Penn. Asso. for Retarded Children v. Commonwealth of Pennsylvania,* 334 F.Supp. 1257 (E.D.Pa.1971), (hereinafter "PARC") and *Mills v. Bd. of Edu. of District of Columbia,* 348 F.Supp. 866 (D.D.C.1972); *See also* 45 C.F.R. § 84 app. A (citing *Mills* and *PARC* ).

As evidenced by Senator Humphrey's statements and the two district opinions cited, the underpinnings of Section 504 are founded in Constitutional law, and the statute together with its later regulations represent a curious intertwining of the doctrines of Equal Protection and Due Process. The *Mills* decision relied on both the Equal Protection and Due Process Clauses of the Fourteenth Amendment, but the legislative comments indicate reliance only on Equal Protection in enacting Section 504. Congress in effect codified in Section 504 the constitutional right to equal protection. *Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977), *modified,* 612 F.2d 84 (3d Cir.1979), *rev'd,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); (expressly declined to address the

merits of Section 504 but decided on a different statute). However, it was not until four years later that the regulations implementing Section 504 were promulgated. These specifically set out notice and hearing requirements, elements of due process. 45 C.F.R. § 84 *et seq.* (1977). Consequently, until June 3, 1977, the effective date of the regulations,[8] schools and state programs receiving federal monies could be held only to standards sounding in equal protection law.

To assure that the handicapped receive the benefits due them under the federally funded programs, the cases in marked spirit have held that Section 504 imposes affirmative obligations on state and local officials to provide such benefits.[9] *S–1 v. Turlington,* 635 F.2d 342, 347 (5th Cir.), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981) [both the EHA and Section 504, as remedial statutes, should be broadly applied and liberally construed]; *Tatro v. State of Texas,* 625 F.2d 557, 565 (5th Cir.1980) [failure to provide CIC procedure was held a violation of Section 504]; *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir.1980), *vacated as moot,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) [failure to provide interpreter services violated Section 504]; *Dopico v. Goldschmidt,* 687 F.2d 644 (2d Cir.1982) [recipients must take affirmative steps to accommodate the handicapped in public transportation]; *Adashunas v. Negley,* 626 F.2d 600, 603 (7th Cir.1980) [Section 504 does provide the handicapped with affirmative rights]; *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir.1977) [failure to make urban mass transit fully accessible to handicapped violates Section 504]; *Lloyd v. Regional Transp. Authority,* 548 F.2d 1277,

1280 (7th Cir.1977) [Section 504 established affirmative rights as to use of public transportation by handicapped]; *Doe v. Marshall, supra,* [Section 504 required that students with severe psychiatric difficulties be allowed to participate in football despite UIL regulation]; *Georgia Ass'n of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga.1981) [Section 504 required more than the standard 180-day instructional period for mentally retarded child]; *Halderman v. Pennhurst State School & Hospital, supra,* [retarded residents of institution entitled to individualized program]; *Crawford v. University of North Carolina,* 440 F.Supp. 1047 (M.D.N.C.1977) [deaf student entitled to an interpreter for graduate courses].

The genesis of affirmative rights under Section 504 is found in Section 601 or Title VI of the Civil Rights Act of 1964[10] which was construed in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). Section 504 closely tracks Title VI. The statutory language in both is virtually identical, and the legislative history indicates that Section 504 was expressly modeled after Title VI and Title IX of the Civil Rights Act. *Brown v. Sibley,* 650 F.2d 760, 767 (5th Cir.1981); *Lloyd, supra,* 548 F.2d at 1280; *Gladys J. v. Pearland Ind. School Dist.,* 520 F.Supp. 869, 874 (S.D.Tex.1981). In *Lau,* the Supreme Court, relying solely on Title VI, upheld the right of Chinese children to have bilingual instruction. The Court held that "there is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education."

---

**8.** 42 F.R. 22676 (May 4, 1977).

**9.** The Court notes the recent case of *Monahan v. Nebraska,* 687 F.2d 1164 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983), which, if followed, would yield a contrary result in this case. The Eighth Circuit, relying on *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), held that Section 504 is not an affirmative-action statute. "We think, rather, that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of educa-

tion of handicapped children." 687 F.2d at 1171.

Although there has been no such definitive pronouncement from the Fifth Circuit on the standard of care under Section 504, the tenor of the cases cited in the text of this opinion demonstrates undeniably that the Fifth Circuit Court of Appeals is more willing to embrace affirmative action. Accordingly, this Court is persuaded to follow the line of cases which requires affirmative action, rather than applying the spirit and ruling of *Monahan.*

**10.** 42 U.S.C. § 2000d (1981).

414 U.S. at 566, 94 S.Ct. at 788. The Court required affirmative relief in order that Chinese-speaking children could benefit from the school system.

The Seventh Circuit discussed in depth this comparison of Section 504 and Title VI and relied exclusively on *Lau* for its holding that the defendants had an affirmative obligation to equip the public transportation system so that the handicapped would have an equal opportunity to use it for travel. *Lloyd, supra,* 548 F.2d at 1281. Subsequently, the Fifth Circuit adopted the analysis of *Lloyd* to find an implied right of action under Section 504. *Camenisch v. University of Texas, supra.* More recently, the district court in Georgia employed the same rationale, citing *Lau,* to grant an injunction, enjoining the defendants from refusing to extend the 180-day school year to accommodate the needs of the mentally retarded children in the suit. *Georgia Ass'n of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga.1981).

> Just as some special treatment was necessary for the Chinese-speaking students in *Lau* to enjoy the benefits of their education, some special treatment may be necessary for handicapped children to benefit from theirs. If a child needed a special service to gain equal benefit from his education, the denial of that service would constitute discrimination in violation of Section 504. Individual attention to the needs of each handicapped child is the only way to determine whether such special or additional services are needed.

*Id.* at 1280.

This concept of affirmative action under Title VI with regard to education is certainly not new. In 1967, the Fifth Circuit ordered the defendants to submit an affirmative desegregation plan where it was found that black children were being denied equal educational benefits. *Bossier Parish School Bd. v. Lemon,* 370 F.2d 847 (5th Cir.), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

The Supreme Court has recently placed certain parameters on the extent of affirmative action under Section 504. In *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Court held that Section 504 did not forbid professional schools from imposing physical qualifications for admission, specifically, requiring a certain level of hearing before allowing admission to the nursing program. This effectively excluded the partially deaf plaintiff from the program. This ruling does not invalidate the other cases cited which required affirmative action under Section 504. The Fifth Circuit observed in *Camenisch, supra,* 616 F.2d at 133, that "the Supreme Court's decision in *Southeastern Community College* says only that Section 504 does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefits of the training." *Accord, Tatro v. State of Texas,* 625 F.2d 557, 564 (5th Cir.1980). *Southeastern Community College* is inapplicable in the present case because with the appropriate education, plaintiff would be able to better cope with his environment and thus realize the principal benefits of the school district's program.

Although not a basis for this opinion, the EHA is closely aligned with Section 504, both in language and in purpose. Indeed, the regulations implementing Section 504 refer to the EHA as one means of meeting the standard required under Section 504. 45 C.F.R. § 84.33(b)(2) (1977). The term that is common to both is "free appropriate public education." Both statutes direct that a recipient of federal funds shall provide a free appropriate public education to each qualified handicapped person. 45 C.F.R. § 84.33(a) (1977); 20 U.S.C. § 1412(1) (1982). The Supreme Court in *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), has recently resolved the question surrounding the definition or interpretation of this term, "free appropriate public education," and its analysis was much akin to that in *Lau.*

> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It

would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education.

*Id.* 102 S.Ct. at 3047. Similarly, *Lau* reasoned that a Chinese-speaking child would receive no benefit by simply sitting in a classroom using English texts and listening only to English-speaking teachers. In this respect, this Court finds *Lau* and *Rowley* entirely congruous. The *Rowley* Court concluded

> that the "basic floor of opportunity" provided by the [EHA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

*Id.* This is consistent with the analyses in the cases cited above that Section 504 requires affirmative action to assure that the handicapped child receives an equal opportunity to benefit from his education.

■ After considering the legislative intent and the relation of Section 504 with constitutional law and with Title VI, the Court concludes that defendants in the present case had an affirmative duty to David to provide the special treatment which he needed in order to derive educational benefit equal to the benefits received by other children in their public education. Defendants had the affirmative duty to investigate his individual needs to determine what special or additional services would be needed and then to set about to provide those services.

■ In determining whether defendants breached their affirmative duty, the Court must employ the same evidentiary standards as used in Title VII cases. *New York State Asso. for Retarded Children v. Carey,* 612 F.2d 644, 649 (2d Cir.1979) [cited with approval by the Fifth Circuit in *Prewitt v. United States Postal Service,* 662 F.2d 292, 307 (5th Cir.1981)]. It is a general principle of discrimination law that once the plaintiff has established a *prima facie* case that he has been discriminated against, the defendant must present evidence to rebut the inference of illegality. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The agency then is obliged to make at least some substantial showing in court that its action was justified. *Carey,* 612 F.2d at 650. This is the same analysis used by the courts in applying the sister statute, Title VI, after which Section 504 was modeled. *Wade v. Mississippi Co-op Extension Service,* 528 F.2d 508 (5th Cir.1976).

■ 9. After applying the facts listed above, the Court is of the opinion that plaintiffs have made out a *prima facie* case of discrimination under Section 504. The parents presented David to the defendant school district for testing and placement in 1975. The psychologist, Ms. Cooper, found after evaluating David that no appropriate class existed at that time and recommended that he continue his education at the private school, Memorial Hall. She explained this to the mother at their meeting in September 1975. Findings 4–6.

A TEA official spoke with Ms. Cooper, after Arlene H. had called the TEA, about this recommendation against public schooling, whereupon the psychologist changed, indeed, reversed her opinion. In the spring of 1976, Ms. Cooper recommended[11] that David be placed in an EMR class, the same type of class that she had thought inappropriate for him in the fall of 1975. Findings 8 and 9. According to her testimony at trial, Ms. Cooper knew of no change in the EMR program or in David, and she could not reconcile this departure from her earlier recommendation.

David is not mentally retarded. He is a student with learning disabilities. Finding 1. Consequently, placing him in an EMR curriculum would not be appropriate, and he would be denied equal benefits of the public education.[12] The type of program

11. Dorothea Cooper was on the ARD Committee which recommended the EMR class for David.

12. For the conclusion as to appropriate placement for David, the Court places its greatest reliance on the testimony of Dr. Martinez. First, her credentials demonstrate that not only is she well qualified in the field of psychology

for the EMR is not geared particularly toward remedying language difficulties, David's main weakness. These classes deal more with the basics. Further, they are not as individualized as are the classes for the learning disabled. Finding 28. The mentally retarded children have a problem with abstract reasoning, whereas one of David's strengths is in non-verbal abstract logic. Findings 24 and 28. Accordingly, David's appropriate placement should have been, not with EMR, but with children with language problems. Additionally, he should have been placed in a situation where he would be encouraged to achieve more and more difficult work, not placed with students working at levels lower than his. Finding 25. Dr. Martinez testified that, in her opinion, it would have been detrimental to David's emotional stability to place him in the EMR class. He was already insecure and lacked self confidence, and he would tend to model his behavior after the EMR students, confirming his poor image of himself.

To rebut the *prima facie* case, defendants contend that their offer of a place for David in the EMR class was compliance with Section 504. They argue that David was given the option of the class and the education that was available and that he was not turned away. Defendants submit that this demonstrates that they did not discriminate against David. Testimony of Lucinda Randall.

Additionally, defendants cite Dr. Martinez's testimony for the defense that it would not have been unreasonable to place David in an EMR class with close observation, to be moved if such action proved to be warranted. Further, defendants assert that the law was unclear in 1975 and 1976 and that their duty to handicapped students was not well defined. Testimony of Don

Weston. Finally, it is the defendants' position that the parents voluntarily withdrew David from the Spring Branch Independent School District and that he was not rejected. Testimony of Janie Fox Jones, Dorothea Cooper, and Lucinda Randall.

Under the law as it existed in 1975, defendants had a duty to do more than simply provide David a seat in an EMR classroom. The *Lau* decision in 1974 under Title VI and the decisions under Section 504 following the *Lau* rationale make it quite clear that the defendants had an affirmative duty to provide specialized treatment for David in the areas of language disabilities. They had the duty of analyzing individually the needs of David and to structure a program suited to those needs. This format was not offered to David or his parents. A similar claim by defendants in *McDaniel, supra,* 511 F.Supp. at 1279, that plaintiffs were not being entirely excluded from the system, was rejected by the Georgia District Court. The opening of the door to the EMR classroom did not satisfy the duty under Section 504, and this first argument must therefore fail.

Defendants' second argument likewise misses the mark. Dr. Martinez stated that it would not be unreasonable to place David in an EMR class for observation, but she also stated that it would be reasonable to assign him to a regular classroom to be monitored. Testimony of Dr. Martinez. The fact that it might not have been unreasonable to place David in an EMR class with close monitoring does not equal the affirmative duty required. David might have been able to exist temporarily in the EMR class, but the evidence reveals that he would not have benefited from the program as the EMR students did. Findings 28 and 29. This is unequal treatment of the handi-

---

but in education as well. Second, her explanations of David's problems and the problems of handicapped children generally were logical and intelligible. Also, her evaluations of David were consistent with those made by prior examiners, and her comparisons of the mentally retarded and the learning disabled were in keeping with the observations made by defendants' official, Jan Barnett, a former special education teacher. Finally, it is meaningful that

the Spring Branch psychologist, Josephine Briggs, who evaluated David in November 1980, relied extensively on Dr. Martinez's report. In particular, Ms. Briggs adopted Dr. Martinez's report for "Suggested Instructional and/or Learning Strategies" which, in this Court's view, related directly to the placement decision made by defendants' ARD committee to place David in a learning disabled class. Plaintiffs' Exhibit 1 at 513–15.

capped students, not to speak of any comparison with normal students and the benefits which they gained from their public education.

The third argument that the law was uncertain is without merit. The Court has cited above the 1974 *Lau* decision, the legislative history of Section 504, two landmark district court cases in the field of education, and caselaw construing Title VI, the model statute for Section 504. By virtue of these sources, the defendants had notice of their affirmative duty under Section 504 long before the events of 1975.

Finally, the Court finds the argument of voluntary withdrawal to be untenable. In September 1975, Ms. Cooper explained to the mother that Spring Branch did not have a situation which she could recommend as appropriate for David. A mother concerned for her son's welfare would not, in this Court's estimation, logically put the boy in an EMR class when the defendant's own psychologist has recommended against it. Certainly, it would be difficult to imagine that the Spring Branch officials would do so without a positive recommendation from Ms. Cooper. The placement of David at Memorial Hall in the fall of 1975 was not a voluntary withdrawal by Arlene H. but was entirely consistent with Ms. Cooper's recommendation.

It is true that a public education was subsequently offered to David in the spring, but it was an EMR class which Ms. Cooper had explained only a few months earlier would be inappropriate for David's needs. Further, the Court has determined that plaintiffs have made a *prima facie* case of discrimination by showing that an EMR class would not be an appropriate placement. It would be faulty and circuitous reasoning indeed to absolve the defendants of liability under Section 504 by holding that parents can preserve their right to monetary recovery only by subjecting their child to continuing discriminatory treatment. Such a position has never been the law under any discrimination statutes of which this Court is aware. However, this is not to say that parents may themselves determine what is unequal treatment under the law and expect to recover damages on

their own assessment. The factual and legal foundation must be present, as in any discrimination case.

In summary, defendants have not made the required showing that their actions were justified, and the Court concludes that defendants have not rebutted the inference of discrimination under Section 504.

### B. Identification and Notice

■ 10. On June 3, 1977, the regulations implementing Section 504 became effective, 42 F.R. 22676 (May 4, 1977). Interjected into the statute was a different concept of Constitutional law, Due Process rights. Until the regulations were promulgated, the cases construing Section 504 and Title VI, its sister statute, were phrased in terms common only to Equal Protection theories. The Committee Report to the Senate indicates that the Congress intended for due process rights to be incorporated into Section 504 by the new regulations:

> This approach to implementation of Section 504, which closely follows [Title VI], ... would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and permit a judicial remedy through a private action.

S.Rep. No. 93–1297, 93 Cong.2d Sess. 39–40, *reprinted in* 4 U.S.Code Cong. & Admin. News at 6373, 6391 (1974). The Fifth Circuit has observed that "section 504 ... provides protections and procedures similar to those of the EHA." *S–1 v. Turlington*, 635 F.2d 342, 350 (5th Cir.), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). Within the regulations, recipient schools were given until "the earliest practicable time and in no event later than September 1, 1978," to come into full compliance. 45 C.F.R. § 84.33(d) (1977).

With respect to the traditional due process safeguards, § 84.36 of the regulations provide that the public schools are to establish and implement a system of notice, opportunity for parents to examine records, an impartial hearing, representation of

counsel, and review. 45 C.F.R. § 84.36 (1977). However, a preliminary procedure, an issue in this case, directs the recipient school to

> (a) Undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education; and

> (b) Take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart.

45 C.F.R. § 84.32 (1977). This second provision is not the customary due process rights of notice and hearing which are required before a property right is extinguished. The identification and notice in § 84.32 are to ensure that students eligible under the statute are not unknowingly excluded and to publicize their rights so that they may know of the opportunity of a free appropriate public education. It is more information-giving so that the parents and the handicapped may choose whether they desire to participate in the public program. *See* 45 C.F.R. § 84 app. A, Subpart D (1977). In addition, there are the traditional notice and hearing procedures under § 84.36.

Section 84.32 establishes two separate mandates: (1) to undertake to identify and locate and (2) to take appropriate steps to notify. The identification process is separate from that of notification, and the Congress specifically put these in different subparts (a) and (b). Identification is establishing the identity of the unserved handicapped. Stated differently, it is ascertaining the names of persons not receiving a public education. Notice, on the other hand, is the giving of information. *Black's Law Dictionary* at 671 and 957 (5th ed. 1979). These are two completely independent processes carried out for different purposes.

As to identification, the regulation directs the public school to "undertake to identify and locate" the unserved handicapped students. In this respect, Spring Branch took

action to visit all private schools, mailed out brochures, spoke at meetings, contacted pediatricians, and did, in this Court's opinion, undertake to identify qualified handicapped children. Finding of Fact 17. It may be that defendants did not identify every unserved student. But this is not what the provision requires. It directs that the recipient is to *undertake* to identify and locate those children. The district did not go through the closed files, but at the time the laws were changing the schools found themselves short of personnel and finances to carry out every possible project. The officials in charge made the decision to concentrate on the media blitz and to channel their efforts and funds in this area in the beginning. Later more clerks were hired, and eventually a program was begun to start back through all of the closed files. Finding of Fact 14. The Court does not find this procedure to be an unreasonable choice when considering the great upheaval in the system.

With·regard to notice, the regulation directs the recipient to "take appropriate steps to notify". The Court concludes that Spring Branch did indeed take appropriate steps by their mass media campaign. Additionally, when specific parents of handicapped children were identified, they were sent a handbook explaining their rights. Finding of Fact 17.

11. Hence, the Court concludes that there was no violation of the identification and notification provisions of Section 504. The defendants did undertake to identify and locate every qualified handicapped person residing in their jurisdiction who was not receiving a public education, and they did take appropriate steps to notify these persons and their parents of the defendants' duty under the pertinent regulations of the statute.

### 4. Damages

■ 12. Defendants have submitted two reasons why, even if liability is found, plaintiffs should not be awarded damages.[13]

---

**13.** This is apart from the conclusion that damages may be awardable under Section 504. *See* Conclusion 3.

The first is an evidentiary proposition which was raised and ruled on at trial. Defendants claim that the checks introduced by plaintiffs to show the costs of private education are hearsay evidence and that defendants are denied the right to cross-examine the person charging for the services to determine the nature and reasonableness of the charges. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Further, the declarant "is a person who makes a statement," an oral or written assertion. *Id.* 801(a) and (b). The Court allowed the checks to be admitted to show that the parents paid the costs, and the father testified that when he received the invoices from the school, he sent a check for the amount billed. Hence, the check itself is not a statement but an operative fact of the transaction of payment, the father's performance of a contract. 6 *Wigmore, Evidence* § 1770 at 264 (Chadbourn rev. 1976). Even if the checks could be considered out of court statements, the parents were the declarants and were cross-examined at trial.

13. The second argument urged is that plaintiffs unduly delayed in presenting David for re-evaluation by the Spring Branch Independent School District after they learned of their legal rights under the new laws. It is true that the duty to mitigate damages persists as long as damages are suffered and may be reasonably reduced. *Schwartz v. NMS Industries, Inc.,* 575 F.2d 553, 556 (5th Cir.1978). Under the doctrine of avoidable consequences a plaintiff may be denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent the losses. *Ford Motor Co. v. Dallas Power & Light,* 499 F.2d 400, 415 (5th Cir.1974). In other words, a plaintiff cannot sit still and let damages pile up when reasonable steps would prevent further losses.

Plaintiffs learned in 1979 of the new laws and regulations which had become effective since their last meeting with the defendants in 1976. However, plaintiffs delayed for a whole year in contacting the district. If contact had been made immediately in the fall of 1979, it is likely that the testing and necessary placement decision could have been made before the spring of 1980. The parents delayed because they were uncertain whether David would function well in the public school and because they were unsure of their legal rights. Finding of Fact 19. This is not good cause for delay if they were truly interested in a free appropriate education as they claim in this lawsuit.

19. Accordingly, the Court determines that the monies expended by the plaintiffs from the spring of 1980 forward shall not be recoverable as plaintiffs, with reasonable diligence, could have arranged with defendants to have David enrolled in a Spring Branch school by that time.

### Conclusion

After examining the full record, the parties' arguments and the applicable law, the Court concludes that defendants violated Section 504 and are liable in damages to the plaintiffs. Specifically, defendants failed to carry out their affirmative duty to David to provide the special treatment which he needed in order to derive educational benefit equal to the benefits received by other children in their public education. The total amount of damages due is limited to costs expended for the private education of David, $24,259.

In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

Plaintiffs are hereby directed to submit a Final Judgment incorporating by reference the foregoing Findings of Fact and Conclusions of Law within twenty (20) days of receipt hereof.